IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>v.<br><br>FRANK JOSEPH COMA (1),<br>MICHAEL JOSEPH COMA (2),<br>DAVID PATRICK VALLEY (3),<br><br>       Defendants. | Case No.: 3:22-cr-00044-TMB-MMS<br><br><br>**OMNIBUS ORDER ON<br>MOTIONS TO SUPPRESS<br>(DKTS. 109, 168, 173)** |

The matter comes before the Court on the three Final Reports and Recommendations ("Final R&Rs") of the Chief Magistrate Judge,[1] recommending the Court deny Defendant Frank Joseph Coma's ("F. Coma"), Michael Joseph Coma's ("M. Coma"), and David Patrick Valley's ("Valley") Motions to Suppress (the "Motions").[2] F. Coma, M. Coma, and Valley objected to the Initial Reports and Recommendations ("Initial R&Rs").[3] The Government objected to a portion of the Initial R&R as to F. Coma[4] but did not respond to any objections.[5] The Chief Magistrate Judge addressed the objections in the Final R&Rs.[6] F. Coma, M. Coma, and Valley then objected to the

---

[1] Dkt. 296 (F. Coma Final R&R); Dkt. 297 (Valley Final R&R); Dkt. 298 (M. Coma Final R&R).
[2] Dkt. 109 (F. Coma Motion to Suppress); Dkt. 168 (Valley Motion to Suppress); Dkt. 173 (M. Coma Motion to Suppress).
[3] Dkt. 287 (F. Coma Objection to Initial R&R); Dkt. 295 (M. Coma Objection to Initial R&R); Dkt. 269 (F. Coma Initial R&R); Dkt. 270 (Valley Initial R&R); Dkt. 271 (M. Coma Initial R&R).
[4] Dkt. 285 (Government Objection to F. Coma Initial R&R).
[5] *See* Dkt. (absence).
[6] Dkt. 296; Dkt. 297; Dkt. 298.

1

Final R&Rs,[7] and Valley also joined F. Coma's and M. Coma's objections to the Final R&Rs.[8] The Government did not respond to this second set of objections or object to the Final R&Rs.[9] Valley subsequently filed a motion for *de novo* review of the Final R&R at Docket 297.[10] Pursuant to statute, the Court has conducted a *de novo* review of those portions of the Final R&Rs to which objections were filed,[11] and for the reasons discussed below, the Court **DENIES** Valley's Motion at Docket 320 and **ACCEPTS and ADOPTS** the Final R&Rs at Docket 296, 297, and 298. Accordingly, the Motions at Docket 109, 168, and 173 are **DENIED**.

## I.    BACKGROUND

The Court assumes the parties' familiarity with the underlying facts and proceedings in this case, relevant portions of which are detailed in the Final R&Rs.[12] In November 2021, United States Postal Inspection Service Inspector Andrew Grow ("USPIS Grow") alerted to and isolated a parcel containing controlled substances sent to a U.S. Post Office ("P.O.") box held by Amanda Pikus ("Pikus"), an incarcerated person, in Kodiak.[13] A K-9 unit ("K-9 Denali") responded to the parcel, and law enforcement searched it pursuant to a warrant, finding 11.63 grams of counterfeit "M30"

---

[7] Dkt. 316 (F. Coma Objection to Final R&R); Dkt. 315 (M. Coma Objection to Final R&R); Dkt. 314 (Valley Objection to Final R&R).

[8] Dkt. 317 (Motion to Join Co-Defendants' Objections); Dkt. 322 (Text Order Granting Motion to Join).

[9] Dkt. (absence).

[10] Dkt. 320 (Motion for *De Novo* Review of Magistrate Judge's Final Report and Recommendation).

[11] 28 U.S.C. § 636(b)(1)(C) ("Within fourteen days after being served with a copy [of the magistrate judge's proposed findings and recommendations], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.").

[12] *See* Dkt. 296 at 5–9; Dkt. 297 at 3–4; Dkt. 298 at 3–4.

[13] Dkt. 296 at 5.

Case 3:22-cr-00044-TMB-MMS   Document 328   Filed 08/21/24   Page 2 of 68

pills believed to contain fentanyl and 59 grams of methamphetamine.[14] Pursuant to the warrant, law enforcement replaced the controlled substances with a representative sample, an electronic monitoring device, and "Clue Spray," and arranged a controlled delivery.[15]

On December 8, 2021, law enforcement officers observed F. Coma and Veronica Naughton ("Naughton") enter the post office, approach Pikus's P.O. box, exit carrying the subject parcel, and leave in a vehicle driven by Marc Vaudrin ("Vaudrin").[16] Officers followed the vehicle to a nearby McDonald's restaurant, Naughton exited the vehicle without the parcel, and F. Coma and Vaudrin continued driving.[17] While following the vehicle, officers received a "faint alert" from the monitoring device but were unable to determine whether the parcel had been opened.[18]

Officers continued to follow the vehicle to an apartment complex, where they observed F. Coma exit the vehicle, briefly enter Unit #3 (F. Coma's apartment), exit, and enter Unit #2 (Valley's apartment) appearing to carry a bulky item under his sweatshirt.[19] Electronic monitoring indicated the parcel was in Unit #2.[20]

At around 2:57 p.m., officers knocked and announced at Unit #2, and Valley opened the door.[21] While holding their firearms "at guard"—at waist-level pointed at the ground—officers instructed Valley, F. Coma, and M. Coma to place their hands in the air, stand in a line, and face the outside wall of the apartment, and detained them outside Unit #2 pending a separate search warrant.[22] Officers then performed a security sweep of Unit #2 and found an opened parcel in a

---

[14] *Id.* at 6.
[15] *Id.*
[16] *Id.* at 7.
[17] *Id.*
[18] *Id.*
[19] *Id.* at 8.
[20] *Id.*
[21] Dkt. 297 at 3.
[22] *Id.*; Dkt. 296 at 8.

garbage can.[23] F. Coma, M. Coma, and Valley were separately brought into the bathroom of Unit #2 and their hands were examined with ultraviolet light.[24] F. Coma's and M. Coma's hands tested positive for Clue Spray, but Valley's did not.[25]

M. Coma was brought back outside, seated in the back of the patrol car, and officers placed a backpack he was wearing in the front seat.[26] An officer searched the backpack and found a digital scale, two small "dime" bags, and a cellphone.[27] M. Coma was arrested and taken into custody.[28] The officer testified that dime bags and digital scales are utilized for packaging and distributing controlling substances, and that cellphones often contain communications related to drug transactions.[29]

Officers requested F. Coma provide the keys to Unit #3 under threat that they would forcibly enter Unit #3.[30] F. Coma provided the keys, and officers searched Unit #3 and found methamphetamine.[31] Applying for search warrants for Units #2 and #3, officers attested to the preceding events, the presence of methamphetamine in Unit #3, and that F. Coma had consented to the search of Unit #3.[32] Both warrants were granted, and F. Coma was arrested.[33]

Valley, F. Coma, and M. Coma were handcuffed until at least 4:00 p.m.[34] During this time, officers informed Valley that he was not free to leave and advised him of his *Miranda* rights.[35]

---

[23] Dkt. 296 at 8.
[24] *Id.*; Dkt. 298 at 3–4.
[25] Dkt. 296 at 8; Dkt. 298 at 3–4.
[26] Dkt. 298 at 4.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.* at 8–9.
[33] *Id.* at 9.
[34] Dkt. 297 at 3.
[35] *Id.*

4

Officers also seized his cellphone without his consent and obtained a search warrant for it seven days later on December 15, 2021.[36] Valley was not taken into custody on December 8, 2021, and he was arrested approximately six months later.[37]

On May 18, 2022, F. Coma, M. Coma, and Valley were charged by indictment with one count of attempted possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846, and a criminal forfeiture allegation.[38]

### A. Motions to Suppress

F. Coma, M. Coma, and Valley subsequently filed individual motions to suppress evidence related to the searches and seizures performed by law enforcement officers during the encounter.[39]

#### 1. F. Coma Motion to Suppress

On February 15, 2023, F. Coma moved to suppress all evidence from the searches related to the search and seizure of the parcel sent via USPS and the search of the apartments.[40] He argued that: (1) he has standing to assert a Fourth Amendment claim as to the USPS parcel; (2) the United States Postal Inspection Service lacked probable cause to hold the parcel; (3) the affidavit supporting the search warrant for the parcel was insufficient; (4) the parcel was held for an unreasonable duration before K-9 Denali's sniff search; (5) K-9 Denali's sniff was unreliable; (6) officers lacked probable cause to enter Unit #2 without a warrant; (7) officers lacked probable cause for his arrest; (8) the officers' use of Clue Spray under ultraviolet light amounted an

---

[36] *Id.*
[37] *Id.*
[38] Dkt. 2 (Indictment).
[39] Dkt. 109; Dkt. 168; Dkt. 173.
[40] Dkt. 109.

5

impermissible warrantless search under the Fourth Amendment; and (9) the search of Unit #3 violated his Fourth Amendment rights.[41]

The Government responded to F. Coma's Motion, arguing: (1) F. Coma lacked Fourth Amendment standing to challenge the search and seizure of the parcel; (2) there was sufficient probable cause to support the search warrant; (3) the parcel was held for a reasonable time before K-9 Denali performed the sniff search; (4) F. Coma lacked standing to challenge the search of Unit #2; (5) exigent circumstances warranted the warrantless search of Unit #2; and (6) the independent source doctrine foreclosed the need to suppress evidence arising out of the search of Unit #3.[42]

Replying, F. Coma argued: (1) exigent circumstances did not justify the warrantless search of Unit #2; (2) law enforcement had an opportunity to obtain a search warrant but declined to do so; and (3) law enforcement violated the "knock and talk" rule established by the United States Supreme Court in *Kentucky v. King*.[43]

On July 17, 2023, codefendants M. Coma and Valley separately joined F. Coma's Motion.[44]

2. <u>M. Coma Motion to Suppress</u>

On July 18, 2023, M. Coma additionally moved to suppress: (1) the fruits of the arrest of M. Coma; (2) the fruits of the search of M. Coma's person; (3) the fruits of the search of M. Coma's backpack; (4) evidence seized from M. Coma's backpack pursuant to warrant 3KO-21-164SW;

---

[41] *See generally id.*
[42] *See generally* Dkt. 119 (Government Response in Opposition to F. Coma's Motion to Suppress).
[43] *See generally* Dkt. 141 (F. Coma's Reply to Government's Response in Opposition) (citing *Kentucky v. King*, 563 U.S. 452, 471–72 (2011)).
[44] *See* Dkt. 172 (M. Coma Joinder to Motion); Dkt. 171 (Valley Joinder to Motion).

6

and (5) evidence seized pursuant to search warrant 3KO-21-163SW.[45] He argued that: (1) his arrest was unconstitutional; (2) the search of his person was unconstitutional; (3) the search of his backpack was unconstitutional and he did not knowingly and voluntarily consent to a search of the backpack; and (4) the cellphone warrant was derivative of law enforcement's illegal activities.[46]

Opposing, the Government argued that: (1) M. Coma was merely detained, and even if there was an arrest, it was supported by a warrant and probable cause; (2) the use of an ultraviolet light on M. Coma's hands was not a Fourth Amendment search; (3) M. Coma consented to the search of his backpack; and (4) law enforcement searched M. Coma's cellphone pursuant to a valid warrant.[47]

### 3. Valley Motion to Suppress

On July 17, 2023, Valley additionally moved to suppress "the fruits of the illegal seizure of his person that resulted in the unlawful confiscation of his cellphone and eventual search of that illegally obtained cellphone pursuant to an invalid search warrant."[48] He argued that: (1) his detention was an arrest for which officers required probable cause; (2) probable cause did not exist to support his arrest; (3) the seizure of his cellphone was illegal; and (4) the search warrant lacked probable cause and was invalid.[49]

Opposing, the Government argued that: (1) Valley's temporary detention during the initial sweep of Unit #2 was permissible; (2) Valley's cellphone was lawfully seized; and (3) the search warrants for Valley's cellphone were supported by probable cause.[50]

---

[45] Dkt. 173 at 1–2.
[46] *Id.* at 6–10.
[47] *See generally* Dkt. 188 (Response in Opposition to M. Coma's Motion to Suppress).
[48] Dkt. 168 at 1.
[49] *Id.* at 9–16.
[50] Dkt. 186 (Government Response in Opposition to Valley's Motion to Suppress) at 9–15.

## B. Initial Report and Recommendations

On January 22, 2024, the Magistrate Judge issued three Initial R&Rs to the Motions to Suppress.[51]

### 1. Initial R&R as to F. Coma

Recommending the Court deny F. Coma's Motion,[52] the Magistrate Judge made the following findings: (1) both F. Coma and M. Coma lacked standing to challenge the seizure or search of the parcel because "neither . . . had a reasonable expectation of privacy in a parcel addressed to another person"[53]; (2) law enforcement had sufficient probable cause to search and seize the parcel[54]; (3) the Government had not justified the delay between the initial seizure of the parcel and the K-9 sniff[55]; (4) the search warrant application was sufficient because K-9 Denali was reliable and law enforcement "did not materially or intentionally omit information from the affidavit"[56]; (5) both F. Coma and M. Coma lacked standing to challenge entry into Unit #2 because neither had a reasonable expectation of privacy in that apartment, although Valley did have standing as a resident[57]; (6) even if F. Coma and M. Coma did have a reasonable expectation of privacy in Unit #2, exigent circumstances justified initial entry[58]; (7) law enforcement had probable cause to enter Unit #2[59]; (8) exigent circumstances justified the second entry into Unit #2 after the defendants had been detained[60]; (9) there was sufficient probable cause to arrest

---

[51] Dkt. 269; Dkt. 270; Dkt. 271.
[52] *See generally* Dkt. 269.
[53] *Id.* at 8, 11.
[54] *Id.* at 11–13.
[55] *Id.* at 13–15.
[56] *Id.* at 15–18.
[57] *Id.* at 18–22.
[58] *Id.* at 22–25.
[59] *Id.* at 25–26.
[60] *Id.* at 26–27.

F. Coma[61]; (10) law enforcement's use of Clue Spray under ultraviolet light was permissible under the Fourth Amendment[62]; and (11) the independent source exception applied to the search and search warrant of Unit #3 such that methamphetamine found in Unit #3 should not be suppressed.[63]

## 2. Initial R&R as to M. Coma

Recommending the Court deny M. Coma's Motion,[64] the Magistrate Judge made the following findings: (1) M. Coma's arrest did not violate the Fourth Amendment because there was sufficient probable cause to sustain an arrest[65]; (2) use of Clue Spray under ultraviolet light did not violate M. Coma's Fourth Amendment rights because "shining the [ultraviolet light] was not a search under the Fourth Amendment," and even if it was a search, "M. Coma was under arrest and . . . it would be a search incident to arrest"[66]; (3) the search of M. Coma's backpack was lawful because he consented to its search or, alternatively, as a search incident to his arrest[67]; and (4) to the extent M. Coma argues that the cellphone warrant or supporting affidavit were facially insufficient, the cellphone warrant was supported by probable cause.[68]

## 3. Initial R&R as to Valley

Recommending the Court deny Valley's Motion,[69] the Chief Magistrate Judge made the following findings: (1) Valley's temporary detention did not constitute an arrest[70]; (2) even if Valley was arrested, there was probable cause to support an arrest[71]; (3) law enforcement's seizure

---

[61] *Id.* at 27–28.
[62] *Id.* at 29–31.
[63] *Id.* at 31–35.
[64] *See generally* Dkt. 271.
[65] *Id.* at 4–6.
[66] *Id.*
[67] *Id.* at 7–11.
[68] *Id.* at 11–12.
[69] *See generally* Dkt. 270.
[70] *Id.* at 3–6.
[71] *Id.* at 6–8.

of Valley's cellphone did not warrant suppression because it was supported by probable cause and the delay in obtaining a search warrant was reasonable[72]; and (4) the cellphone warrant was supported by probable cause and the affidavit was facially sufficient.[73]

### C. Objections to the Initial Report and Recommendations

F. Coma, M. Coma, and Valley each filed objections to the Initial R&Rs, and the Government filed a narrow objection to the Initial R&R as to F. Coma.[74] Neither party responded to the other's objections.[75]

#### 1. Objections to F. Coma Initial R&R

F. Coma lodged five main objections.[76] First, F. Coma contested four of the Court's factual findings as to whether: (1) law enforcement found the "opened parcel in the garbage can"; (2) Pikus was previously suspected of receiving controlled substances by mail; (3) law enforcement could determine via electronic tracking that the parcel "travel[ed] with F. Coma" after Naughton exited the vehicle; and (4) "many officers" observed F. Coma walk into Unit #2 with a bulky item under his sweatshirt.[77] Second, F. Coma argued that the Court erroneously relied on *Michigan v. Tyler*[78] and *Fisher v. City of San Jose*[79] in finding that exigent circumstances warranted entry into Unit #2 because those cases involved "an ongoing public safety risk" and are distinguishable.[80] Third, he urged the Court to address his argument that law enforcement violated

---

[72] *Id.* at 8–10.
[73] *Id.* at 10–12.
[74] Dkt. 287; Dkt. 295; Dkt. 284; Dkt. 287.
[75] *See* Dkt. (absence).
[76] *See generally* Dkt. 287.
[77] *Id.* at 1–2.
[78] 436 U.S. 499 (1978).
[79] 558 F.3d 1069 (9th Cir. 2009).
[80] Dkt. 287 at 2–5.

10

*Kentucky v. King*'s "knock and talk" rule.[81] Fourth, he contended that the Court's finding that the use of ultraviolet light was a search incident to arrest was inconsistent with the Initial R&R.[82] Last, F. Coma reasserted that the independent source doctrine did not justify the search of Unit #3.[83]

The Government "narrow[ly]" objected to the Initial R&R, contesting the Court's finding that the Government had not justified the delay between seizure of the parcel and the K-9 sniff.[84] It argued that "there is no indication of a five-day delay between the seizure of the parcel and the dog sniff" and that rather, "the dog sniff occurred the day after [USPIS] directed the parcel to be seized."[85] Moreover, it suggested that "any delay between the parcel arriving in Kodiak and [USPIS] being alerted is immaterial to the Court's Fourth Amendment analysis."[86]

### 2. Objections to M. Coma Initial R&R

M. Coma lodged three main objections to the Initial R&R and "incorporate[d] by reference his co-Defendant's objections [at] [Dockets 287 and 284]."[87] First, M. Coma contested the Chief Magistrate Judge erred by finding there was probable cause to arrest him.[88] He maintained that he was "merely present on the premises" and that he was arrested when he was initially detained by law enforcement before officers used ultraviolet light on his hands.[89] As such, he asserts, officers lacked probable cause to arrest him.[90] Second, he disputed the Chief Magistrate Judge's finding

---

[81] *Id.* at 5.
[82] *Id.* at 5–6.
[83] *Id.* at 6–7.
[84] Dkt. 285 (Government's Objection to Initial Report and Recommendation on Motion to Suppress) at 1.
[85] *Id.* at 2.
[86] *Id.* at 1–2.
[87] *See generally* Dkt. 295.
[88] *Id.* at 2–4.
[89] *Id.*
[90] *Id.*

that using ultraviolet light on his hands was a valid search incident to arrest.[91] He suggested that the Court employed "circular logic" by holding that the use of ultraviolet light was not a search, or alternatively, that it was a search incident to arrest.[92] Last, he argued that the Court erred in finding that the search of his backpack was a search incident to arrest because "[l]aw enforcement waited an unreasonable amount of time to search the backpack under the totality of the circumstances," the backpack was not in his immediate control, and officers "were not looking for weapons[] or destructible evidence" when they searched it.[93] Therefore, he argues the search of his backpack was not a lawful search incident to his arrest.[94]

3. Objections to Valley Initial R&R

Valley lodged three main objections to the Initial R&R and "join[ed] co-defendant [F.] Coma's Objections to the Chief Magistrate Judge's Initial [R&R]."[95] First, Valley argued that his detention amounted to an arrest because he was "locked in the back of a police car, handcuffed with his arms behind his back, for one hour, interviewed with a *Miranda* warning, and told he was not free to leave," "officers who were present had firearms readily available to employ," and "there was no testimony . . . that Mr. Valley had any knowledge of what was occurring with his co-defendants" during this time.[96] He also asserted that he "was not free to leave once he exited his apartment" and that his "hour-long detention was not supported by probable cause" and "was not temporary," resulting in an "unconstitutional seizure."[97]

---

[91] *Id.* at 4.
[92] *Id.*
[93] *Id.* at 4–5.
[94] *Id.*
[95] Dkt. 284.
[96] *Id.* at 1–3.
[97] *Id.* at 3.

Case 3:22-cr-00044-TMB-MMS   Document 328   Filed 08/21/24   Page 12 of 68

Second, Valley argued there was no probable cause to support his arrest and "the simple presence of the package in [his] apartment . . . is not sufficient to establish" it.[98] He noted that F. Coma "had been in Mr. Valley's apartment for five minutes or less before law enforcement knocked and announced" and "[n]o evidence was presented that Mr. Valley was aware of the presence of the parcel in his apartment."[99] Although officers found $29,000 in Unit #2, he observed this money "was not found until after [his] liberty was curtailed and law enforcement had procured a search warrant for his apartment" and only after "they subjected Mr. Valley to custodial detention."[100]

Last, Valley argued that the Chief Magistrate Judge erred in finding that the search and seizure of his cellphone was supported by probable cause and that the week-long delay in obtaining a search warrant was not "deliberate, reckless, or grossly negligent conduct."[101] He observed that "law enforcement could have applied for a search of the cellphone at the same time as the applications were made for the search of the apartments" but asserted they "did not do that because they did not believe that they had sufficient evidence to support such a warrant" and "did not believe that there was evidence connecting Mr. Valley with the suspect parcel."[102] Therefore, he argues "there is no evidence connecting [him] with the Coma brothers in a drug conspiracy."[103]

## D. Final Report and Recommendations

On March 7, 2024, the Chief Magistrate Judge issued three Final R&Rs to the Motions to Suppress and addressed the parties' objections.[104]

---

[98] *Id.* at 3–4.
[99] *Id.* at 4.
[100] *Id.*
[101] *Id.* at 4–5.
[102] *Id.* at 5.
[103] *Id.*
[104] Dkt. 296; Dkt. 297; Dkt. 298.

13

1. <u>Final R&R as to F. Coma</u>

Responding to F. Coma's objections, and continuing to recommend that F. Coma's Motion should be denied,[105] the Chief Magistrate Judge made the following findings: (1) the record supported the Court's factual findings regarding the location of the opened parcel, whether Pikus was a known affiliate suspected in drug trafficking, the tracked movement of the parcel, and law enforcement's observation of F. Coma carrying a bulky item[106]; (2) its reliance on *Tyler* and *Fisher* was proper because these cases did not limit exigent circumstances to safety emergencies and negated the proposition that law enforcement "must continuously weigh whether there are exigent circumstances and immediately stop once . . . the initial exigency has been resolved"[107]; (3) *King* is inapposite because the exigency began when the parcel was opened before law enforcement knocked and announced and "[t]he manner in which law enforcement knocked . . . is irrelevant"[108]; (4) the use of Clue Spray was constitutional because it occurred prior to F. Coma's arrest and, regardless, there was sufficient probable cause to arrest F. Coma prior to use of the ultraviolet light, modifying and clarifying the Initial R&R[109]; and (5) the independent source doctrine prevents suppression because there was "ample probable cause" to support a search warrant application for Unit #3 and because law enforcement would have sought a search warrant even absent the discovery of methamphetamine.[110]

Responding to the Government's objection, the Chief Magistrate Judge "agree[d] with the [G]overnment in part" and "modifie[d] its [Initial R&R]" to find that "the parcel was not initially

---

[105] *See generally* Dkt. 296.
[106] *Id.* at 35–37.
[107] *Id.* at 37–38.
[108] *Id.* at 38–39.
[109] *Id.* at 39–40.
[110] *Id.* at 41–42.

intercepted a material amount of time prior to [USPIS] being notified" and was "held an appropriate amount of time" prior to the K-9 sniff.[111]

2. Final R&R as to M. Coma

The Chief Magistrate Judge also continued to recommend that M. Coma's Motion should be denied.[112] Responding to M. Coma's objections, the Chief Magistrate Judge found that: (1) M. Coma was not arrested upon his initial detention because "a reasonable and innocent person would [not] have assumed that he was being taken into custody *indefinitely*" at that point[113]; (2) even if M. Coma had been arrested, there was sufficient probable cause to arrest him even without evidence of the Clue Spray[114]; (3) the use of ultraviolet light was permissible because M. Coma was arrested after Clue Spray was found, or alternatively, if he was arrested prior, the search was valid as a search incident to arrest[115]; and (4) the record supported the Court's finding that the half-hour delay between M. Coma's initial detention and the search of his backpack was reasonable.[116]

---

[111] *Id.* at 42–44.
[112] *See generally* Dkt. 298.
[113] *Id.* at 13 (citing *United States v. Patterson*, 648 F.2d 625, 634 (9th Cir. 1981)).
[114] *Id.* at 14.
[115] *Id.* at 14–15.
[116] *Id.*

15

3. Final R&R as to Valley

The Chief Magistrate Judge also continued to recommend that Valley's Motion should be denied.[117] Responding to Valley's objections, the Chief Magistrate Judge found that: (1) "a reasonable person in Valley's shoes would have known that he was not being held indefinitely," Valley's detention was reasonable, and no excessive force was used[118]; (2) there was probable cause to arrest Valley "[e]ven excising the evidence of further crimes such as drug paraphernalia and the large sum of money" found in Valley's apartment[119]; and (3) "[t]he evidence found on Valley's cellphone should not be suppressed" because the seizure was not wrongful, the search warrant was supported by probable cause, and there was no evidence of "deliberate, reckless, or grossly negligent conduct."[120]

E. Objections to the Final Report and Recommendation

F. Coma, M. Coma, and Valley each filed objections to the three Final R&Rs,[121] and Valley joined F. Coma's and M. Coma's objections.[122]

1. Objections to F. Coma Final R&R

F. Coma lodges the following seven objections to the Final R&R, preserving his prior objections:[123] (1) three of the Chief Magistrate Judge's factual findings remain in error[124]; (2) he had standing to challenge the search of Unit #2 because he had a reasonable expectation of privacy in Valley's apartment as a social guest[125]; (3) "the government failed to establish that the exigent

---

[117] *See generally* Dkt. 297.
[118] *Id.* at 13–14 (citing *United States v. Patterson*, 648 F.2d 625, 634 (9th Cir. 1981)).
[119] *Id.* at 14–15.
[120] *Id.* at 15–16.
[121] Dkt. 314; Dkt. 315; Dkt. 316.
[122] Dkt. 317; Dkt. 322.
[123] *See generally* Dkt. 316.
[124] *Id.* at 13–14.
[125] *Id.* at 14–19.

circumstances doctrine applied" to justify the initial entry into Unit #2, and "the Chief Magistrate Judge erred in concluding otherwise"[126]; (4) law enforcement's subsequent warrantless entry into Unit #2 after detaining the occupants was not supported by exigent circumstances because even if the initial entry was justified, "this exigency was surely not present when all the occupants of the apartment had been removed and placed in handcuffs outside of the apartment"[127]; (5) his "arrest was not supported by probable cause"[128]; (6) the use of ultraviolet light on his hands "cannot be upheld as a search incident to lawful arrest" because it was a search under the Fourth Amendment and, regardless, he "was not under lawful arrest at the time"[129]; and (7) the independent source rule does not apply to justify the search of Unit #3 and the Chief Magistrate Judge erred by "speculat[ing] that it is likely that law enforcement would have obtained a warrant for [Unit] #3" because "probable cause existed to suspect F. Coma of drug dealing and a warrant *could have* been obtained."[130]

### 2. Objections to M. Coma Final R&R

M. Coma lodges two main objections to the Final R&R, incorporating by reference F. Coma's and Valley's objections:[131] (1) his initial detention was not an arrest because "a reasonable innocent person in [the same] circumstances would not have felt free to leave after brief questioning"[132] and "excessive force was used in effecting the initial seizure and detention"[133]; and (2) "[t]he Court's assertion that the [ultraviolet light] search of [his] hands was a valid search

---

[126] *Id.* at 20.
[127] *Id.* at 22–23.
[128] *Id.* at 24–25.
[129] *Id.* at 25–26.
[130] *Id.* at 29.
[131] Dkt. 315 at 1.
[132] Dkt. 315 at 3 (quoting *Charley*, 396 F.3d at 1080).
[133] *Id.*

incident to arrest is in error" because "the arrest itself was unlawful" and "there is no evidence in the record that shining an [ultraviolet light] on [M.] Coma's hands had to occur then and there and could not wait for a proper warrant application."[134]

### 3. Objections to Valley Final R&R

Valley lodges five main objections to the Final R&R, incorporating by reference his previous objections:[135] (1) the Chief Magistrate Judge misapplied Ninth Circuit case law in finding his detention did not amount to an arrest, and law enforcement employed excessive force; (2) he was arrested in his residence without an arrest warrant or probable cause[136]; (3) his arrest lacked probable cause because an arrest lacked probable cause because "law enforcement did not know that [he] resided in Unit #2," that "[his] residence was the destination of the suspect parcel," that "the parcel entered [his] unit," or that "the contents of the parcel were in [his] residence"[137]; (4) the search of his cellphone was unconstitutional because officers "seize[d] his cellphone without a warrant and without his consent" and the Chief Magistrate Judge "failed to identify an applicable exception to the warrant requirement under the circumstances, finding only that probable cause existed to seize the phone"[138]; and (5) officers' omission that the cellphone was the product of a warrantless search from the affidavit in support of the search warrant was "deliberate, reckless, or grossly negligent conduct," warranting suppression.[139]

---

[134] *Id.* at 6–7 (citing *United States v. Hudson*, 100 F.3d 1409, 1419 (9th Cir 1996)).
[135] Dkt. 314 at 1.
[136] *Id.* at 10–12.
[137] *Id.* at 12–13.
[138] *Id.* at 17.
[139] *Id.* at 18.

*F. Motion for De Novo Review*

Valley also filed a motion for *de novo* review of the Final R&R as to him.[140] Noting that the District Court must review those portions of an R&R to which objections have been filed under 28 U.S.C. § 636(b)(1), Valley also asks the Court "to conduct a *de novo* review of all portions, even those not objected to, of the [Final] R&R" because the parties "were confined to a page limit" for their initial objections.[141] Citing out-of-district authority, he asserts that "the District Court may elect to review an R&R under a more exacting standard even if no objections are filed" and that the statute "does not preclude further review by the district judge, *sua sponte* or *at the request of a party*, under a *de novo* or any other standard."[142]

## II.    LEGAL STANDARDS

The matter is now before this Court pursuant to 28 U.S.C. § 636(b)(1), which provides that a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" and shall review objections *de novo*.[143] For topics on which no objections are filed, "[n]either the Constitution nor [28 U.S.C. § 636(b)(1)] requires a district judge to review, *de novo*, findings and recommendations that the parties themselves accept as correct."[144]

---

[140] Dkt. 320.

[141] *Id.* at 3.

[142] *Id.* at 2 (quoting *United States v. Marin*, No. CR18-4011-LTS, 2018 WL 4489463, *3 (N.D. Iowa)).

[143] 28 U.S.C. § 636(b)(1).

[144] *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003); *see also Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."); *United States v. Ramos*, 65 F.4th 427, 434 (9th Cir. 2023) (articulating that "the district court ha[s] no obligation to provide individualized analysis of each objection.").

19

### III. DISCUSSION

Having reviewed *de novo* the parties' initial briefing, the Initial and Final R&Rs, the parties' objections, and the record, the Court agrees with the Chief Magistrate Judge's recommendation to deny the Motions. Concluding that F. Coma's, M. Coma's, and Valley's objections have already been raised and were addressed in the Final R&Rs, or otherwise do not merit revision or rejection of the Final R&Rs, and seeing no basis for *de novo* review of the unobjected-to portions of the Final R&R as to Valley, the Court denies the Motion for *De Novo* Review.

#### A. *F. Coma's objections do not merit revision of the Final R&R.*

Upon a *de novo* review, the Court concludes that F. Coma's objections do not merit revision or rejection of the Final R&R.

#### 1. The factual findings in the Final R&R are not in error and do not merit revision.

The Court concludes that the factual findings in the Final R&R are not in error. F. Coma contests six factual findings in the Final R&R, and the Court addresses each of F. Coma's objections in turn.

##### a. *The record supports the Chief Magistrate Judge's finding that law enforcement found the opened parcel in a garbage can.*

As to F. Coma's objection regarding whether law enforcement found the "open parcel in the garbage can," the Court agrees with the Chief Magistrate Judge that the record supports this finding. According to law enforcement testimony, officers observed "in plain view . . . the parcel in the garbage"[145] and that they found the contents of the parcel in a closet.[146] Moreover, officers

---

[145] Dkt. 244 (Transcript) at 98:22–24.
[146] *Id.* at 77:4–10.

identified the opened parcel in the garbage and its contents in the closet via photographic evidence.[147] Therefore, the record supports that law enforcement found the open parcel in the garbage can.

### b. The record supports the Chief Magistrate Judge's finding that Amanda Pikus was previously suspected of receiving controlled substances by mail.

As to F. Coma's objection regarding whether Amanda Pikus was previously suspected of receiving controlled substances by mail, the Court agrees with the Chief Magistrate Judge that the record supports this finding. Law enforcement testified that it "had received a previous tip about [a] parcel being sent to Kodiak in the name of Amanda Pikus" to her Post Office box.[148] Further, officers testified that Pikus was "a known narcotics trafficker and involved in narcotics trafficking"[149] and "known to [law enforcement] to be an affiliate . . . suspected to be involved in the . . . use and traffic dealing with drugs in Kodiak."[150] The record supports this finding, and therefore, the Court finds F. Coma's objections regarding the reliability of this testimony unavailing.

### c. The record supports the Chief Magistrate Judge's finding that law enforcement officers were able to see, via their tracking device, that the parcel was "traveling with F. Coma" after Naughton left the vehicle.

As to F. Coma's objection regarding whether officers could sufficiently track the parcel using G.P.S. monitoring after Naughton left the vehicle, the Court agrees with the Chief Magistrate Judge that the record supports this finding. Law enforcement provided extensive testimony regarding the tracking device and its sensitivity.[151] Further, officers noted that after Naughton

---

[147] *See id.* at 106:9–22; 151:25–153:9.
[148] *Id.* at 12:13–21.
[149] *Id.* at 55:1–3.
[150] *Id.* at 85:18–20.
[151] *Id.* at 20:14–24; 27:10–28:22; 29:15–21.

exited the vehicle, "the [G.P.S.] tracker stayed with the vehicle," officers received a "faint" signal that indicated the parcel "could have been opened in the vehicle" during the drive, and then the signal became "clear" once they arrived at the apartment complex.[152] Moreover, law enforcement testified that Coast Guard Investigative Special Agents assisting with the controlled delivery and also following the vehicle "observed and confirmed [Naughton] did not have it" and that "it did not appear when she got out that she had it anywhere on her person."[153] The Court disagrees with F. Coma's assertion that "[t]here is no clear testimony that investigators could track the movement of the package with any specificity."[154] Rather, testimony indicates that officers could sufficiently track the package to confirm that it "travel[ed] with F. Coma" after Naughton left the vehicle. The Court therefore concludes that the record supports this finding.

> ### d. The record supports the Chief Magistrate Judge's finding that "many officers" observed F. Coma enter Unit #2 with a bulky item under his shirt.

As to F. Coma's objection regarding whether "many officers" observed him carrying a bulky item under his shirt between Unit #3 and Unit #2, the Court agrees with the Chief Magistrate Judge that the record supports this finding. Alaska State Trooper Seargeant Garrett Frost ("AST Frost") testified that when the vehicle arrived at the apartment building, "at least two officers, [AST Frost], Inspector Grow, and [Coast Guard Investigative Service] Special Agent Woods [Special Agent Woods]" were positioned to "observe the vehicle and observe everything that was going on at that particular time."[155] AST Frost testified that he personally observed F. Coma exit Unit #3 "hiding [an item] underneath his shirt" and then enter Unit #2.[156] He noted it appeared to

---

[152] *Id.* at 28:1–29:3.
[153] *Id.* at 91:6–13.
[154] Dkt. 287 at 2–5.
[155] *Id.* at 96:9–12.
[156] Dkt. 244 at 94:23–95:7.

be a "bulky item" consistent with the size of the parcel and that "both [AST Frost] and the other special agent [Special Agent Woods] could tell [F. Coma] was just kind of walking like he was hiding something."[157] AST Frost also noted that Special Agent Woods reported seeing F. Coma carrying a bulky item in his sweatshirt.[158]

Further, USPIS Grow testified that "other agents observed . . . something bulky under [F. Coma's] clothing[] and [that he] then went into Unit #2."[159] Two agents were involved in the controlled delivery, Special Agent Woods and Coast Guard Investigative Service Special Agent Thompson.[160] This testimony suggests that several agents and officers, or at least three, observed F. Coma carrying a bulky item under his shirt from Unit #3 to Unit #2. Therefore, the record indicates that many, as in *multiple* or *several*, agents and/or officers witnessed F. Coma carrying an item consistent with the size of the parcel into Unit #2. Thus, based on a lay interpretation of the word "many," the record supports this finding, and the Court concludes that revisions are not merited.

   e. *The record supports the Chief Magistrate Judge's finding that USPIS Grow received a tip from AST Frost that Amanda Pikus's P.O. Box had been sent parcels containing controlled substances.*

As to F. Coma's objection regarding whether USPIS Grow received a tip from AST Frost that parcels containing controlled substances had been sent to Amanda Pikus's P.O. Box, the Court concludes that the record supports this finding. USPIS Grow testified that Alaska State Troopers provided "a previous tip about [a] parcel being sent to Kodiak in the name of Amanda Pikus" and that the tip indicated "boxes were being sent to the post office to Amanda Pikus that could contain

---

[157] *Id.* at 149:16–22.
[158] Exh. D1-A at 2.
[159] Dkt. 244 at 29:4–8.
[160] *Id.* at 88:10–20.

narcotics, not that one was inbound, but it was a tip [AST] got that they were coming."[161] Further, USPIS Grow stated that he "believe[d] it was, at the time, [AST] Frost" who relayed this information "[t]o the best of [Grow's] recollection," but he clarified that he did not have any notes regarding that tip.[162] AST Frost testified that he did not "not specifically" tip USPIS Grow that there was a package coming for Pikus.[163] However, USPIS Grow clarified that the tip was generalized and did not convey that a specific parcel was inbound, which is consistent with AST Frost's testimony. Moreover, USPIS Grow suggests that AST Frost provided this tip "to the best of [his] recollection."[164] Regardless, the Court concludes that the record supports this finding and that revisions are not merited.

> f. *The record supports the Chief Magistrate Judge's finding that after arriving at the apartment complex, law enforcement continued to receive indication that the transmitter was traveling with F. Coma and that they believed that it was in Unit #2.*

As to F. Coma's objection regarding whether law enforcement continued to receive indication that the transmitter was with F. Coma in Unit #2, the Court concludes that the record supports this finding. According to USPIS Grow's testimony, after F. Coma entered Unit #2, officers "were able to confirm that the box was moving with Frank Coma and . . . confirmed that there was a positive indication the parcel was opened."[165] And, even if the G.P.S. unit did not identify the precise location of the parcel and could not definitively confirm it was in Unit #2, monitoring did confirm that the parcel "was on the side of Unit 2 and 3."[166] Therefore, the Court disagrees with F. Coma's objection that "[t]here is no testimony that [] USPIS Grow was able to

---

[161] *Id.* at 12:12–17; 34:19–23; 52:13–19.
[162] *Id.* at 35:1–5; 52:22–23.
[163] *Id.* at 136:1–6.
[164] *Id.* at 52:22–23.
[165] *Id.* at 29:15–21.
[166] *Id.* at 41:21–42:24.

track the package via [G.P.S.] with any accuracy at the apartment complex."[167] Rather, testimony indicates that officers could sufficiently track the package to confirm that it "was moving with [F. Coma]" at the apartment complex and that officers believed he brought it into Unit #2.[168] The Court concludes the record supports this finding.

    2.  <u>Neither F. Coma nor M. Coma have standing to challenge the search of Unit #2.</u>

    The Court agrees with the Chief Magistrate Judge that F. Coma and M. Coma both lack standing to assert a Fourth Amendment claim as to the entry into Unit #2. In order to bring a Fourth Amendment challenge to the search of a place or an item seized, the person asserting these rights must have a subjective expectation of privacy in the area searched or item seized, and that expectation must be objectively reasonable.[169] The defendant bears the burden of establishing his legitimate expectation of privacy.[170] While an overnight guest in a home may claim the protection of the Fourth Amendment,[171] a person who is merely legitimately present in a home or place with the owner's consent may not claim the protection of the householder.[172] Nor can these claims be asserted vicariously.[173] Moreover, a defendant must put forth evidence to support his claim of standing; he cannot simply rely on the allegations in the government's pleading.[174]

    The Chief Magistrate Judge concluded that both F. Coma and M. Coma lacked standing to challenge entry into Unit #2 because neither had a reasonable expectation of privacy in it.[175] Regarding F. Coma's claim that he had standing as an overnight guest, the Court cited *United*

---

[167] Dkt. 287 at 2–5.
[168] Dkt. 244 at 29:15–21.
[169] *United States v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir. 2007).
[170] *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).
[171] *Minnesota v. Olson*, 495 U.S. 91 (1990).
[172] *Minnesota v. Carter*, 525 U.S. 83, 90 (1998).
[173] *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978).
[174] *United States v. Zermeno*, 66 F.3d 1058, 1061 (9th Cir. 1995).
[175] Dkt. 269 at 18–22.

*States v. Martinez*[176] for the proposition that defendants who do not hold joint control of the right to exclude others lack a reasonable right to privacy and noted that although "F. Coma was welcome to spend the night intermittently, Unit #2 was not his home."[177] Regarding M. Coma's claim that he was an "invited guest," the Court noted that he did not provide testimony establishing his connection to Unit #2 and that he lacked standing.[178] However, it found that Valley had standing as a resident of Unit #2.[179]

F. Coma argues that he had a reasonable expectation of privacy in Unit #2 as a "social guest" because it was the "residence of his lifelong friend" and "the functional equivalent of [F. Coma's] living room."[180] While this may indicate F. Coma's status as an invitee, this is insufficient to establish a privacy interest in the apartment. The Court finds *United States v. Martinez*[181] instructive. In that case, the defendant similarly moved to suppress a warrantless entry into an apartment after a controlled delivery.[182] Noting that the defendant was "merely an invitee in the apartment and someone who had been there that day," and had "presented no evidence that he owned, rented, or leased [the] apartment; slept there; or kept his possessions there," this Court found that the defendant failed to establish a legitimate privacy interest in the apartment.[183] Similarly here, although F. Coma testified that he visited Unit #2 frequently and occasionally spent the night, he also acknowledged that he did not have keys, pay rent or utilities, did not often leave items there, "had never resided at [Unit #2]," and would "absolutely not" enter Unit #2 without

---

[176] No. 3:09-CR-00027-TMB, 2010 WL 11531344 (D. Alaska Mar. 18, 2010).
[177] Dkt. 269 at 21.
[178] *Id.* at 20, 22.
[179] *Id.* at 22.
[180] Dkt. 316 at 17.
[181] No. 3:09-CR-00027-TMB, 2010 WL 11531344 (D. Alaska Mar. 18, 2010), *aff'd*, 485 F. App'x 195 (9th Cir. 2012).
[182] *Id.*
[183] *Id.* at *2.

Case 3:22-cr-00044-TMB-MMS   Document 328   Filed 08/21/24   Page 26 of 68

Valley present.[184] The Court agrees with the Chief Magistrate Judge that while F. Coma presented evidence he was legitimately on the premises, and may have been a welcome and frequent visitor, this is insufficient to establish a privacy interest.

F. Coma also suggests that the Chief Magistrate Judge's focus on whether an individual holds joint control or a right to exclude others "misread[s]" this Court's decision in *Martinez* and the Ninth Circuit's decision in *United States v. Davis*.[185] The Court disagrees with this characterization of the Final R&R. In *Martinez*, this Court cited *United States v. Davis*, observing that significant factors indicating a privacy interest, such as "joint control over the apartment" or "the right to exclude others," present in *Davis* were markedly absent in *Martinez*.[186] However, the Court did not hold, and the Chief Magistrate Judge did not indicate it held, that joint control or the right to exclude others were *required* to establish a legitimate privacy interest. Rather, the defendant in *Martinez* "ha[d] not provided . . . any evidence that might establish his legitimate privacy interest in . . . the apartment," such as joint control or the right to exclude others.[187] Citing *Martinez* and *Davis*, the Chief Magistrate Judge analogized that F. Coma also had not provided such evidence. The Court agrees with the Chief Magistrate Judge that F. Coma's invitee status did not confer standing to challenge the search of Unit #2.

Similarly, the Court also agrees with the Chief Magistrate Judge that M. Coma did not have a reasonable expectation of privacy in Unit #2. Although M. Coma argues he was an "invited guest," he did not provide testimony regarding his connection to Unit #2.[188] Rather, like the

---

[184] Dkt. 258 at 1; D1-SS at 2, ¶ 6; Dkt. 245 at 41:13–15; 47:22–24.
[185] Dkt. 316 at 17.
[186] *Martinez*, 2010 WL 11531344, at *2.
[187] *Id.*
[188] Dkt. 316 at 20, 22.

defendant in *Martinez*, he "has not provided, or even offered to provide, any evidence that might establish his legitimate privacy interest in . . . the apartment."[189] Therefore, the Court concludes that both F. Coma and M. Coma lack standing to challenge the search of Unit #2. However, the Court agrees with the Chief Magistrate Judge that Valley, as the resident of Unit #2, does have standing to challenge entry.

3. Exigent circumstances justified the initial entry into Unit #2.

The Court also agrees with the Chief Magistrate Judge that even if F. Coma had standing to challenge the search of Unit #2, the Government established that exigent circumstances justified initial entry. Although warrantless entries are "presumptively unreasonable," this presumption may be overcome "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment."[190] For instance, one such exigency exists "when officers, acting on probable cause and in good faith, reasonably believe from the totality of the circumstances that [] evidence or contraband will imminently be destroyed."[191] "The government bears the burden of showing specific and articulable facts to justify the finding of exigent circumstances"[192] and must establish "that a warrant could not have been obtained in time."[193] However, "police may not rely on the need to prevent destruction of evidence when that exigency was 'created' or 'manufactured' by the conduct of the police."[194]

---

[189] *Martinez*, 2010 WL 11531344, at *2.
[190] *United States v. Iwai*, 930 F.3d 1141, 1144 (9th Cir. 2019) (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)).
[191] *Id.* (quoting *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002)).
[192] *Id.* (quoting *Ojeda*, 276 F.3d at 488).
[193] *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1161 (9th Cir. 2014).
[194] *King*, 563 U.S. at 461.

28

Citing *United States v. Hackett*,[195] the Chief Magistrate Judge noted that "law enforcement entered to prevent the destruction of evidence" because they "observed the parcel likely being brought into Unit #2 and believed that the package had been opened" and "there was a risk that the defendants would have discovered the sham substance and/or the transmitter, and then subsequently begin to flee or destroy evidence."[196] The Chief Magistrate Judge also concluded that *King* is inapposite because the exigency began when the parcel was opened before law enforcement knocked and announced and that "[t]he manner in which law enforcement knocked . . . is irrelevant."[197] Therefore, the Court concluded that exigent circumstances justified entry into Unit #2 as to all three defendants.[198]

F. Coma argues that the Chief Magistrate Judge erred in finding that the Government established that exigent circumstances applied. First, he asserts that "any exigency was of the law enforcement officers' own making" because officers could have performed a traffic stop or apprehended F. Coma and Vaudrin before they entered the apartment if they were concerned about evidence destruction.[199] Pointing to G.P.S. monitoring data, he argues that "the package was 'likely' opened between the post office and the apartment."[200] Because law enforcement could have apprehended F. Coma earlier, he argues, they "created the exigency which they allege necessitated the warrantless entry."[201] Alternatively, he argues that law enforcement violated the

---

[195] 638 F.2d 1179 (9th Cir. 1980).
[196] Dkt. 269 at 24.
[197] *Id.* at 38–39.
[198] *Id.* at 25.
[199] Dkt. 316 at 20.
[200] *Id.*
[201] *Id.*

29

"knock and talk rule" in *Kentucky v. King* by using coercive demands to enter, and thus the exigent circumstances exception does not apply.[202]

Second, he argues that "the [G]overnment failed to show an articulable basis for the belief that evidence destruction was imminent" or explain why a warrant could not be secured in time because officers detained the occupants immediately and could have applied for a search warrant before entering the apartment.[203] He further asserts that *United States v. Iwai*[204] and *Hackett* are distinguishable because in those cases, agents either heard a noise from within suggesting evidence destruction or did not receive a response upon attempting entry.[205]

The Court finds F. Coma's arguments unavailing. First, the Court concludes that law enforcement did not create the exigency in this case. In *Hackett*, the Ninth Circuit considered whether agents created an exigency by not apprehending a defendant prior to taking a crate containing hidden drugs to his apartment.[206] The court noted that "the agents did not specifically intend either to arrest [the defendant] or to make an arrest at a residence," and that "[t]hey were interested in arresting only whoever knew the cocaine was in the crate, i.e., whoever was present when the secret compartment was opened."[207] Further, the court noted that because only 20 to 30 minutes elapsed between the agents' suspicions and the opening of the crate, it was unreasonable to expect agents to procure a telephonic warrant "while in pursuit of a moving suspect upon mere 'suspicion' that the suspect is headed for his residence" and that "not until [the defendant] actually arrived and unloaded the crate . . . did it become clear an arrest would take place there."[208]

---

[202] Dkt. 287 at 5 (citing *Kentucky v. King*, 558 F.3d 1069 (9th Cir. 2009)).
[203] Dkt. 316 at 20.
[204] 930 F.3d 1141, 1144 (9th Cir. 2019).
[205] Dkt. 316 at 21.
[206] *United States v. Hackett*, 638 F.2d 1179 (9th Cir. 1980).
[207] *Id.* at 1184.
[208] *Id.* at 1185.

Here, officers received a signal that "likely" indicated the parcel had been opened in the vehicle, but it remained possible that the parcel could have been intact upon entering Unit #2. Moreover, officers observed F. Coma carrying what appeared to be the parcel into Unit #2. Therefore, it was reasonable for officers to presume that the occupants would subsequently locate the false substance or transmitter upon opening the parcel and then destroy evidence. Further, under *Hackett*, it would be unreasonable to expect officers engaged in a mobile pursuit of a vehicle to obtain a telephonic warrant, especially where, as here, the vehicle's destination was unclear. F. Coma is correct that law enforcement may not "create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment."[209] But here, the Court concludes that officers did not create the exigency by waiting to intercept F. Coma until he entered Unit #2.

Next, the Court finds that law enforcement did not violate the knock and talk rule in *King*. As noted by the Chief Magistrate Judge, *King* is inapposite because "the use of sham drugs and transmitters can, and did, trigger exigency before law enforcement ever approached the apartment."[210] The Court agrees that the exigency here began before officers knocked and announced, and therefore the manner in which officers did so did not "threaten[] a Fourth Amendment violation" or create the exigency.[211]

Last, the Court finds that the Government established an articulable basis for the belief that evidence destruction was imminent. Although law enforcement immediately apprehended the occupants, none of them had the parcel on them at the time they were detained, and the signal had indicated that the parcel "likely" had been opened. Therefore, it was reasonable for officers to assume that there may have been others in the apartment destroying evidence to justify warrantless

---

[209] *Kentucky v. King*, 563 U.S. 452, 461 (2011).
[210] Dkt. 296 at 39.
[211] Dkt. 141 at 7.

entry and that there was insufficient time to procure a telephonic warrant. Further, under *Iwai* and *Hackett*, the placement of the transmitter in a controlled delivery and its subsequent risk of discovery justified warrantless entry because "[i]mmediate action was necessary" to prevent evidence destruction.[212] Although officers did not hear a noise indicating evidence destruction, as the Ninth Circuit observed in *Iwai*, "to focus on the noises in isolation from all other factors . . . is not a proper 'totality of the circumstances' analysis."[213] Here, the totality of circumstances supported a finding of exigency, including that F. Coma had carried the parcel into the apartment and that transmitter signals indicated it likely had been opened. Therefore, the Court agrees with the Chief Magistrate Judge that both *Iwai* and *Hackett* are instructive and that exigent circumstances justified initial entry into Unit #2.

4.   Exigent circumstances justified the second entry into Unit #2.

The Court also agrees with the Chief Magistrate Judge that exigent circumstances justified subsequent entry into Unit #2. In *Michigan v. Tyler*,[214] the United States Supreme Court held that after a warrantless entry, officials investigating a fire may remain on or return to the premises after a few hours "for a reasonable time to investigate the cause of a blaze after it has been extinguished."[215] The Court noted that "[i]mmediate investigation may also be necessary to preserve evidence from intentional or accidental destruction"; therefore, subsequent warrantless entries "were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of information."[216] The Ninth Circuit in *Fisher v. City of San Jose*[217] also cited *Tyler* for the proposition that officials need not "periodically reassess whether

---

[212] *Hackett*, 638 F.2d at 1182.
[213] *United States v. Iwai*, 930 F.3d 1141, 1145 (9th Cir. 2019).
[214] 436 U.S. 499 (1978).
[215] *Id.* at 510.
[216] *Id.* at 510–11.
[217] 558 F.3d 1069 (9th Cir. 2009).

the exigency persisted" where subsequent warrantless entries are "no more than an actual continuation of the initial [search or] seizure," but are rather necessary "to alleviate the exigent circumstances."[218]

Citing *Tyler* and *Fisher*, the Chief Magistrate Judge noted that law enforcement "may remain on site 'for a reasonable time to investigate' as 'no more than an actual continuation of the' initial entry'" and that such investigation may be necessary to preserve evidence.[219] As officers here continued their presence for only "30 minutes to an hour" after entry to perform subsequent searches and interviews, the Chief Magistrate Judge found this time frame "reasonable and a mere continuation of the initial entry that was justified by exigent circumstances."[220] Further, the Chief Magistrate Judge defended his reliance on *Tyler* and *Fisher*, observing that these cases did not limit exigent circumstances to safety emergencies and negated the proposition that law enforcement "must continuously weigh whether there are exigent circumstances and immediately stop once . . . the initial exigency has been resolved."[221]

F. Coma argues that law enforcement's subsequent warrantless entry into Unit #2 after detaining the occupants was not supported by exigent circumstances because even if the initial entry was justified, "this exigency was surely not present when all the occupants of the apartment had been removed and placed in handcuffs outside of the apartment."[222] He asserts that the Chief Magistrate Judge offers a "strained reading of *Tyler* and *Fisher*" by holding that "a zone of exigency exists, even when the initial exigency has abated, that justifies subsequent warrantless

---

[218] *See id.* at 1077 (permitting subsequent warrantless entries during an armed standoff with defendant).
[219] Dkt. 269 at 27 (quoting *Tyler*, 436 U.S. at 510–511).
[220] *Id.*
[221] *Id.* at 37–38.
[222] Dkt. 316 at 22–23.

entries for an unclear period."[223] He also argues that both cases are "far removed factually" from the present case.[224] Rather, he suggests *Tyler* and *Fisher* stand for the proposition that officials may subsequently enter without a warrant only "when there is an ongoing public safety risk such as a fire or armed confrontation" and only "until the threat has been eliminated or until a public safety response evolves into a criminal investigation."[225]

The Court declines such a narrow interpretation of *Tyler* and *Fisher*. The *Tyler* court acknowledged that subsequent warrantless entries may be necessary to allow officials time to investigate and preserve evidence from destruction.[226] The *Fisher* court plainly extended *Tyler*'s holding to other situations in which an exigency may continue after an initial warrantless entry.[227] Here, as the Chief Magistrate Judge noted, officers performed an initial entry at 2:57 p.m. and remained on the premises for between 30 minutes to an hour, during which time they interviewed the occupants, searched apartments, and located the parcel. This timeframe is even more condensed than in *Tyler*, where officers left and returned several hours later to continue their search. Moreover, both the initial and subsequent entries were justified by imminent destruction of the parcel; although officers detained the occupants, subsequent entry was necessary for officers to investigate, search for other occupants, and prevent destruction of evidence that may have already been initiated. Under *Tyler* and *Fisher*, the Court agrees with the Chief Magistrate Judge that the second warrantless entry was a mere continuation of the initial justified entry and that officers were not required to reassess whether the exigency continued.

---

[223] *Id.* at 23.
[224] *Id.*
[225] *Id.*
[226] *Michigan v. Tyler*, 436 U.S. 499, 510–11 (1978).
[227] *Fisher v. City of San Jose*, 558 F.3d 1069, 1077 (9th Cir. 2009)

5. <u>F. Coma's arrest was supported by probable cause.</u>

The Court also agrees with the Chief Magistrate Judge that officers had probable cause to arrest F. Coma. Officers need probable cause to effect a warrantless arrest.[228] Officers have probable cause when, "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime."[229] Although "mere suspicion, common rumor, or even strong reason to suspect" are insufficient, the arresting officer need not have "conclusive evidence of guilt."[230] However, a person's mere presence or "mere propinquity to . . . criminal activity does not, without more, give rise to probable cause."[231]

Concluding that there was sufficient probable cause to arrest F. Coma,[232] the Chief Magistrate Judge noted that "law enforcement observed him accompany a co-conspirator to retrieve a box that they believed to be controlled substances from the Kodiak Post Office"; that G.P.S. monitoring confirmed the presence of the parcel in the vehicle after the co-conspirator exited; that F. Coma appeared to "enter Unit #2 with a bulk item concealed under his sweatshirt after [law enforcement] receiv[ed] a faint alert"; and that the presence of Clue Spray on F. Coma's hands "suggest[ed] that he had personally handled the contents of the subject parcel."[233] It found that these facts constituted probable cause to arrest F. Coma for attempted possession.[234]

---

[228] *Michigan v. Summers*, 452 U.S. 692, 700 (1981).
[229] *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).
[230] *Id.*
[231] *Id.* at 1074 (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).
[232] Dkt. 296 at 27–28.
[233] *Id.* at 28.
[234] *Id.* at 29.

F. Coma contends that his "arrest was not supported by probable cause."[235] He notes that "[n]o one ever saw the package removed from Vaudrin's vehicle at the apartment complex" and there was "no other evidence that F. Coma was involved with the package."[236] Further, he observes that Naughton was the only individual seen carrying the parcel, no one saw him carrying the parcel into Unit #2, and the G.P.S. transmitter was not precise enough to identify where the parcel was at the apartment complex.[237] Therefore, he asserts the available evidence amounted to "mere suspicion" or "mere propinquity to . . . [his] criminal activity" and failed to establish "that he was anything more than a proximate or peripheral figure to a crime."[238]

The Court disagrees. The record demonstrates that officers observed F. Coma accompany a co-conspirator to retrieve the parcel from Pikus' post office box; Naughton was not seen carrying the parcel when she exited the vehicle at the McDonald's; G.P.S. tracking confirmed the parcel remained in the vehicle on the drive to the apartment complex; officers received a faint alert indicating the parcel may have been opened; officers observed F. Coma enter Unit #3, exit carrying a bulky item the same size as the parcel under his sweatshirt, and then enter Unit #2; and the ultraviolet light revealed clue spray on F. Coma's hands. The Court agrees with the Chief Magistrate Judge that these findings create a "fair probability" that F. Coma committed the crime of attempted possession of controlled substances and that he was not a mere "proximate or peripheral figure to a crime." Therefore, the Court concludes that there was probable cause for his arrest.

---

[235] Dkt. 316 at 24–25.
[236] *Id.* at 25.
[237] Dkt. 109 at 35–36.
[238] *Id.*

36

6. The use of ultraviolet light and Clue Spray on F. Coma's hands is not a search under the Fourth Amendment or, alternatively, is a search incident to a lawful arrest.

The Court also agrees with the Chief Magistrate Judge that the use of ultraviolet light to detect Clue Spray on F. Coma's hands did not violate his Fourth Amendment rights. "[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable,"[239] that is, when "the individual manifested a subjective expectation of privacy in the object of the challenged search" and "society [is] willing to recognize that expectation as reasonable."[240] If law enforcement "uses a device that is not in general public use[] to explore details . . . that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant."[241] The Ninth Circuit has not determined whether the warrantless use of ultraviolet light constitutes a search under the Fourth Amendment,[242] and other circuits are split.[243] The District of Alaska has

---

[239] *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967)).

[240] *Id.* (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)).

[241] *Id.* at 40.

[242] *See United States v. Martinez*, 485 F. App'x 195, 196 (9th Cir. 2012) (affirming lower court decision finding warrantless use of ultraviolet light was justified as search incident to lawful arrest and "[a]ssuming without deciding that the black-light test of [defendant's] hands was a search within the meaning of the Fourth Amendment"); *United States v. Baron*, 860 F.2d 911, 917 (9th Cir. 1988) ("As we have noted . . . the issue is a difficult one on which courts disagree. We need not decide whether the black light test constituted a search within the meaning of the Fourth Amendment, however, because even assuming it was a search, we uphold the district court's denial of the suppression motion on the ground that the evidence revealed in the black light test was admissible as the fruit of a search incident to an arrest.").

[243] *Compare United States v. Williams*, 902 F.2d 678, 680 (8th Cir. 1990) (holding that the use of ultraviolet light to detect drug residue on defendant's hands "does not constitute a fourth amendment search") *with United States v. Kenaan*, 496 F.2d 181, 182 (1st Cir. 1974) ("There can be little doubt that an inspection of one's hands, under an ultraviolet lamp, is the kind of governmental intrusion into one's private domain that is protected by the Fourth Amendment. . . . If the reach of the Fourth Amendment extends to finger-printing . . . and a search of one's clothing or personal effects . . . it should certainly encompass a detailed inspection, by special instrument, of one's skin." (internal citations omitted)).

37

held that "assuming such a test is a search, it is valid when it is conducted as incident to a lawful arrest."[244]

The Chief Magistrate Judge concluded that law enforcement's use of Clue Spray was permissible under the Fourth Amendment.[245] Noting that hands are publicly exposed and ultraviolet lights, or "blacklights," are used by the general public, the Court first suggested that F. Coma did not have a privacy interest in the surface of his hands.[246] Moreover, citing *United States v. Martinez*,[247] the Chief Magistrate Judge determined that even if the use of ultraviolet light to detect Clue Spray did constitute a search, it was a search incident to a lawful arrest because "there was sufficient probable cause to arrest F. Coma and . . . he was placed under arrest."[248] "Therefore, the use of an ultraviolet light did not violate F. Coma's right against unreasonable searches and seizures."[249] The Chief Magistrate Judge "modifie[d] and clarifie[d]" the Initial R&R by finding that the use of Clue Spray was constitutional because it occurred prior to F. Coma's arrest and that, regardless, there was sufficient probable cause to arrest F. Coma prior to use of the ultraviolet light.[250]

F. Coma argues that the use of ultraviolet light on his hands "cannot be upheld as a search incident to lawful arrest" because it was a search under the Fourth Amendment and, regardless, he "was not under lawful arrest at the time."[251] F. Coma argues that the use of ultraviolet light on his hands was a Fourth Amendment search because he had a reasonable expectation of privacy in his

---

[244] *See United States v. Williams*, No. 309CR00027TMBDMS01, 2009 WL 10677828, at *8 (D. Alaska Sept. 21, 2009).
[245] Dkt. 296 at 29–31.
[246] *Id.* at 29–30.
[247] 485 F. App'x 195 (9th Cir. 2012).
[248] Dkt. 296 at 31.
[249] *Id.*
[250] *Id.* at 39–40.
[251] Dkt. 316 at 25–26.

body and because the search used a device akin to a "magnetometer, x-ray, weapons detector, etc., to 'see' what the naked eye cannot see" that was not "in general public use."[252] Noting that USPIS Grow "called the [ultraviolet light] inspection a 'search,'" he also attests to the invasive nature of the process.[253] Moreover, he argues that because he was not under lawful arrest at the time of the ultraviolet light use, it "cannot be thus justified through the search incident to lawful arrest exception as the Chief Magistrate Judge finds."[254]

First, the Court agrees with the Chief Magistrate Judge that the use of ultraviolet light to detect Clue Spray on F. Coma's hands occurred prior to his arrest and as such did not violate his Fourth Amendment rights. The Court notes the Chief Magistrate Judge's observations that "viewing exposed skin is not an intrusion into a space" and that "ultraviolet lights, colloquially referred to as 'blacklights,' are not infrequently used by the general public."[255] However, the Court need not decide this issue because the record reflects that F. Coma was lawfully arrested after the use of ultraviolet light. USPIS Grow testified that Clue Spray powder "can be wiped off with sweat and water" and "does[] [not] stay on for very long" because one "can wash it off and wipe it off at a certain point."[256] Further, USPIS Grow noted that he has observed detained individuals attempting to wipe off Clue Spray with dirt.[257] Therefore, the Court concludes that exigent circumstances justified use of the ultraviolet light to prevent destruction of evidence. Further, the Court observes that the discovery of Clue Spray on F. Coma's and M. Coma's hands distinguished them for arrest, while Valley's hands did not test positive and as such he was not arrested at that

---

[252] Dkt. 109 at 38–40.
[253] Dkt. 316 at 25–26.
[254] *Id.* at 26.
[255] Dkt. 296 at 30.
[256] Dkt. 244 at 32:24–33:3.
[257] *Id.* at 33:4–12.

time. Therefore, the Court agrees with the Chief Magistrate Judge that use of the ultraviolet light to preserve evidence was justified under exigent circumstances and occurred prior to F. Coma's arrest.

Second, even if F. Coma was arrested prior to the ultraviolet light use, the Court agrees with the Chief Magistrate Judge that there was sufficient probable cause to sustain an arrest without detection of the Clue Spray. Officers observed F. Coma accompany Naughton to retrieve the parcel at the post office, drive with the parcel in a vehicle to an apartment building, and then enter Unit #2 carrying what appeared to be the parcel under his sweatshirt. These findings constitute probable cause to arrest F. Coma for attempted possession. Therefore, assuming without deciding that use of the ultraviolet light on F. Coma's hands was a Fourth Amendment search, it was valid as a search incident to a lawful arrest.[258]

7. The independent source doctrine applies to evidence seized during the search of Unit #3.

Last, the Court agrees with the Chief Magistrate Judge that the independent source doctrine applies to evidence seized during the search of Unit #3. Under the independent source doctrine, "suppression is unwarranted, even where evidence was 'initially discovered during, or as a consequence of, an unlawful search,' when that evidence is 'later obtained independently[,] from activities untainted by the initial illegality.'"[259] To avoid suppression, "the Government must show 'that no information gained' from the Fourth Amendment violations 'affected either (1) the law enforcement officers' decision to seek a warrant or (2) the magistrate's decision to grant it.'"[260]

---

[258] *See United States v. Williams*, No. 309CR00027TMBDMS01, 2009 WL 10677828, at *8 (D. Alaska Sept. 21, 2009).

[259] *United States v. Saelee*, 51 F.4th 327, 335 (9th Cir. 2022) (quoting *Murray v. United States*, 487 U.S. 533, 537 (1988)).

[260] *Id.* (quoting *Murray*, 487 U.S. at 539–40).

"The mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant."[261]

The Chief Magistrate Judge concluded that the independent source exception applied to the search of Unit #3.[262] The Chief Magistrate Judge observed that there was probable cause to arrest F. Coma, that law enforcement observed him initially enter Unit #3, and that they "could reasonably have believed that there would be additional evidence of drug trafficking therein" and "would have been interested in searching his apartment."[263] Therefore, although the initial search of Unit #3 violated F. Coma's Fourth Amendment rights because he did not consent and there were no exigent circumstances to justify entry, there was "ample probable cause" to support a search warrant application for Unit #3.[264] Thus, the Court concluded that the independent source doctrine prevents suppression because law enforcement would have sought a search warrant even absent the discovery of methamphetamine.[265] As such, the Chief Magistrate Judge concluded that the methamphetamine found in Unit #3 should not be suppressed.[266]

F. Coma argues that the independent source doctrine does not apply because "[a]bsent the evidence obtained through the illegal entry into [Unit] #3, the warrant application contains no information that [Unit] #3 was likely to contain evidence of drug trafficking."[267] Rather, he asserts that "the [Chief] Magistrate Judge speculates that it is likely that law enforcement would have obtained a warrant for [Unit] #3, even if no illegal entry had occurred because probable cause to

---

[261] *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987).
[262] Dkt. 296 at 31–35.
[263] *Id.* at 34.
[264] *Id.*
[265] *Id.* at 41–42.
[266] *Id.* at 34–35.
[267] Dkt. 316 at 29–30.

41

search this apartment existed independent of the illegal entry."[268] Citing *United States v. Lundin*,[269] F. Coma argues that this legal reasoning relies on "inevitable discovery rationale" and "obviate[s] the warrant requirement of the Fourth Amendment."[270] He suggests this reasoning is incorrect because it asks whether evidence "could have" been obtained by law enforcement, rather than "whether the evidence *actually* was 'obtained independently from activities untainted by the initial illegality.'"[271] Further, F. Coma asserts the Chief Magistrate Judge's "finding that the judicial officer who approved the warrant for [Unit] #3 was not influenced by reference to methamphetamine is pure speculation" because it is "highly prejudicial" and not "benign information."[272] Moreover, absent such evidence, he suggests "the warrant application contains no information that [Unit] #3 was likely to contain evidence of drug trafficking."[273]

The Court agrees with the Chief Magistrate Judge's application of the independent source doctrine. First, the Court acknowledges that law enforcement unlawfully entered Unit #3 because officers demanded the keys by threat of force and no exigent circumstances justified entry. However, the Court also finds that the Government established that the unlawful search of Unit #3 did not influence officers' decision to seek a search warrant and the issuing judicial officer would have found probable cause absent evidence therein. The record shows that officers observed F. Coma accompany a co-conspirator to retrieve the parcel containing sham drugs at the post office, drive in a vehicle with the parcel to his apartment building, enter Unit #3, and then emerge carrying a bulky item the size of the parcel under his sweatshirt. The Ninth Circuit has noted that

---

[268] *Id.* at 28.
[269] 817 F.3d 1151 (9th Cir. 2016).
[270] Dkt. 316 at 29.
[271] *Id.* at 27 (quoting *United States v. Lundin*, 817 F.3d 1151, 1161 (9th Cir. 2016)).
[272] *Id.* at 29.
[273] *Id.* at 29–30.

judicial officers may "draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense," and that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live."[274] Excising statements in the search warrant affidavit regarding F. Coma's consent and the methamphetamine, the Court agrees that there is "ample probable cause" to support the officers' decision to apply for, and the Chief Magistrate Judge's decision to grant, the search warrant application for Unit #3.[275] Therefore, the independent source doctrine applies and prevents suppression of the evidence from Unit #3.

Accordingly, the Court concludes F. Coma's objections do not merit rejection or revision of the Final R&R.

### B. M. Coma's objections do not merit revision of the Final R&R.

Upon a de novo review, the Court concludes that M. Coma's objections do not merit revision or rejection of the Final R&R.

#### 1. M. Coma's initial detention did not constitute an arrest.

The Court agrees with the Chief Magistrate Judge that M. Coma's initial detention did not amount to an arrest. "Whether an arrest has occurred 'depends on all of the surrounding circumstances, including the extent that freedom of movement is curtailed and the degree and type of force or authority used to effectuate the stop.'"[276] The dispositive question is "whether, under all of the circumstances, 'a reasonable person would conclude he was under arrest.'"[277] The Ninth

---

[274] United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986).

[275] See United States v. Saelee, 51 F.4th 327, 336 (9th Cir. 2022) (affirming application of independent source doctrine where warrant application only included findings that "add[ed] nothing, logically or legally, to whether there was probable cause to search the premises" and therefore "did not influence the magistrate judge's decision to issue the warrant").

[276] United States v. Patterson, 648 F.2d 625, 632 (9th Cir. 1981) (quoting United States v. Harrington, 636 F.2d 1182, 1186 (9th Cir. 1981)).

[277] Id. (quoting Harrington, 636 F.2d at 1186).

Circuit considers the duration of detention, use of excessive force, and whether the defendant is free to leave in determining whether an arrest has been effectuated.[278] However, "[an initial detention] is not transformed into an arrest merely because law enforcement agents momentarily restrict person's freedom of movement"; rather, officers "may impose such a restriction to maintain the status quo while making an initial inquiry, provided the force displayed is not excessive under the circumstances."[279] The Ninth Circuit has found excessive force where officers "pointed their guns at the suspects under circumstances not suggesting fears for their personal safety"[280] and "encircled [] and confronted [detainees] with official orders made at gunpoint."[281] Thus, even if an innocent person in the detainee's position might reasonably believe they are not free to leave, an arrest does not occur if "the force used was not excessive and the innocent person could not reasonably have assumed he was being taken into custody indefinitely."[282]

The Chief Magistrate Judge concluded that M. Coma was not arrested upon his initial detention because "a reasonable and innocent person would [not] have assumed that he was being taken into custody *indefinitely*" at that point.[283] Rather, M. Coma was arrested "[o]nce law enforcement discovered the evidence of M. Coma likely having handled the contents of the parcel, and M. Coma's knowledge that law enforcement had found the blue powder on his hands, it was reasonable and apparent to a person in M. Coma's shoes that he was going to be taken into custody then."[284]

---

[278] *Id.* at 632–33 (citing cases).
[279] *Id.* at 633.
[280] *See id.* (quoting *United States v. Ramos-Zaragosa*, 516 F.2d 141, 144 (9th Cir. 1975)).
[281] *See id.* (quoting *United States v. Strickler*, 490 F.2d 378, 380 (9th Cir. 1974)).
[282] *Id.* at 634.
[283] Dkt. 298 at 13 (citing *United States v. Patterson*, 648 F.2d 625, 634 (9th Cir. 1981)).
[284] *Id.* at 13–14.

44

M. Coma reiterates his argument that the Chief Magistrate Judge erred by finding that his initial detention was not an arrest. He argues that the Court's finding "relies on a misstatement of law: that simply not being free to leave is not sufficient [to amount to an arrest]."[285] Rather, citing *United States v. Charley*,[286] he suggests the dispositive question is "whether a reasonable innocent person in [the same] circumstances would not have felt free to leave after brief questioning"[287] or "whether excessive force was used in effecting the initial seizure and detention."[288] He argues that he "was arrested and a Fourth Amendment seizure requiring probable cause occurred when he was placed in handcuffs and forcibly removed from Unit #2 at gunpoint by law enforcement barking orders at him" and "[i]t was at that point that any reasonable person would not feel free to leave or end the encounter after 'brief questioning.'"[289]

The Court agrees with the Chief Magistrate Judge that M. Coma's detention did not constitute an arrest. The record reflects that the officers issued instructions to the occupants with their guns lowered and pointed to the ground, not at the occupants. Further, even if a reasonable person in M. Coma's position did not feel free to leave at that point, officers may "briefly stop[] and detain[] for the purposes of limited inquiry and weapons frisk, or 'to maintain the status quo momentarily while obtaining more information.'"[290] After detaining M. Coma, officers interviewed the occupants and performed a security sweep of Unit #2. Even if an innocent person in M. Coma's position might reasonably believe he was not free to leave, he could not reasonably have assumed he was being taken into custody indefinitely at that point. Notably, M. Coma was

---

[285] Dkt. 315 at 2.
[286] 396 F.3d 1074 (9th Cir. 2005).
[287] Dkt. 315 at 3 (quoting *Charley*, 396 F.3d at 1080).
[288] *Id.*
[289] *Id.*
[290] *United States v. Patterson*, 648 F.2d 625, 633 (9th Cir. 1981).

45

placed under arrest and in the patrol car only after officers discovered Clue Spray on his hands. Therefore, the initial detention was not an arrest.

### 2. There was probable cause to arrest M. Coma.

Alternatively, even if M. Coma's detention did constitute an arrest, the Court agrees with the Chief Magistrate Judge that officers had probable cause independent of the Clue Spray to effectuate it. Probable cause means there is "a fair probability that [the defendant] ha[s] committed a crime"; officers need not have "conclusive evidence of guilt."[291] However, "mere suspicion, common rumor, or even strong reason to suspect"[292] or a person's mere presence or "mere propinquity to . . . criminal activity are insufficient."[293]

The Chief Magistrate Judge concluded that even if M. Coma had been arrested upon his initial detention, there was sufficient probable cause to arrest him even without evidence of the Clue Spray because "[l]aw enforcement knew after its initial sweep (1) that F. Coma had brought a parcel that he believed to contain controlled substances into the apartment; (2) that there had already been an illicit multi-person operation to obtain and transport the parcel to the apartment complex; (3) that the parcel was open; and (4) that M. Coma was in Unit #2."[294] Thus, the Court concluded that "it was sufficiently probable that M. Coma was a co-conspirator and that he had been privy to the intended contents of the parcel."[295]

M. Coma argues he was "merely present on the premises" and that this is insufficient to constitute probable cause for his arrest. He maintains that the Court's reliance on the record absent the Clue Spray to support probable cause for his arrest is "flawed" because "[t]here is no evidence

---

[291] *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).
[292] *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984).
[293] *Lopez*, 482 F.3d at 1074 (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).
[294] Dkt. 298 at 14.
[295] *Id.* at 6.

46

that [F. Coma] believed the parcel contained controlled substances," "Michael Coma was no part of the package retrieval," law enforcement "did not know if the package was in Unit #2," and "they did not know if [he] had handled the package."[296] He continues to assert that "all the officers knew was that he was present at Unit #2" and that his "mere[] presen[ce] on the premises" is insufficient to constitute probable cause supporting his seizure.[297]

However, the record shows that officers observed F. Coma retrieve and transport the parcel to the apartment complex with other coconspirators and then carry what appeared to be the parcel into Unit #2, that the parcel had been opened and disposed of, that the sham drugs were placed in a pantry, and that M. Coma was present in Unit #2 where the contents of the parcel were located. Contrary to M. Coma's assertions, the Court agrees with the Chief Magistrate Judge that these findings create a "fair probability" that M. Coma committed the crime of attempted possession of controlled substances and that he was not a mere "proximate or peripheral figure to a crime." Therefore, the Court concludes that there was probable cause for his arrest independent of the Clue Spray.

3.  The use of ultraviolet light to detect Clue Spray on M. Coma's hands is not a search under the Fourth Amendment or, alternatively, is a search incident to a lawful arrest.

The Court also agrees with the Chief Magistrate Judge that the use of ultraviolet light to detect Clue Spray on M. Coma's hands did not violate his Fourth Amendment rights.

The Chief Magistrate Judge concluded that the use of ultraviolet light did not violate M. Coma's Fourth Amendment rights because "shining the [ultraviolet light] was not a search under the Fourth Amendment," and even if it was a search, "M. Coma was under arrest and . . . it would be a search incident to arrest."[298] In the Final R&R, the Chief Magistrate Judge "modif[ied]

---

[296] Dkt. 315 at 4–5.
[297] *Id.* at 5.
[298] Dkt. 298 at 7, 14–15.

its recommendation to clarify its reasoning that the use of the ultraviolet light was permissible" by "find[ing] M. Coma to have been arrested after Clue Spray was found."[299] However, the Court further clarified that it continued to find that use of the ultraviolet light was not a search under the Fourth Amendment and that M. Coma's rights therefore were not violated.[300] Alternatively, the Chief Magistrate Judge found that if M. Coma was arrested upon initial detention, and the use of ultraviolet light did constitute a search, its use would still be valid as a search incident to arrest.[301]

M. Coma argues that "[t]he Court's assertion that the [ultraviolet light] search of [his] hands was a valid search incident to arrest is in error."[302] He again asserts that he was arrested upon his initial detention, that his arrest was unlawful for lack of probable cause, and therefore "the search of his hands cannot be upheld as a search incident to arrest." Further, he argues that a valid search incident to arrest "is limited to the arrestee's person and to the area within his immediate control" and "from within which he might gain possession of . . . destructible evidence," and "there is no evidence in the record that shining an [ultraviolet light] on [M.] Coma's hands had to occur then and there and could not wait for a proper warrant application."[303] Therefore, he submits that even as a search incident to arrest, the use of ultraviolet light was not justified.[304]

First, the Court concludes that the issue of whether use of ultraviolet light is a search need not be decided because the record reflects that M. Coma was lawfully arrested after its use, and as such did not violate his Fourth Amendment rights. Given officers' testimony that Clue Spray may

---

[299] *Id.* at 14–15.
[300] *Id.* at 15.
[301] *Id.*
[302] Dkt. 315 at 6.
[303] *Id.* at 6–7 (citing *United States v. Hudson*, 100 F.3d 1409, 1419 (9th Cir 1996)).
[304] *Id.* at 7.

be washed or wiped off from the hands, the Court concludes that exigent circumstances justified the warrantless use of ultraviolet light to preserve key evidence.

Alternatively, the Court agrees with the Chief Magistrate Judge that even if M. Coma was arrested prior to the use of ultraviolet light, its use was lawful as a search incident to arrest. An arrestee's hands are certainly part of their person and within their immediate control or "grab area," and in this case, M. Coma could have "gain[ed] possession of . . . destructible evidence" by wiping or removing the Clue Spray from his hands.[305] Therefore, contrary to M. Coma's assertions, there is evidence that a prompt search of his hands was warranted and law enforcement in fact "could not wait for a proper warrant application."[306] Assuming without deciding that using an ultraviolet light as law enforcement did here is a search under the Fourth Amendment, even if M. Coma was arrested before the ultraviolet light use, it would be justified as a valid search incident to his arrest.

4. The search of M. Coma's backpack was a valid search incident to arrest.

The Court further agrees with the Chief Magistrate Judge that the search of M. Coma's backpack was permissible pursuant to M. Coma's consent or otherwise lawful as incident to arrest. Although a person may have a reasonable expectation of privacy in an item like a backpack,[307] consent defeats this expectation.[308] To establish consent, "the government bears the heavy burden of demonstrating that the consent was freely and voluntarily given" under the totality of the circumstances.[309] The Ninth Circuit considers whether "(1) the person was in custody; (2) the officer had his weapon drawn; (3) the officer failed to administer *Miranda* warnings; (4) the officer did not inform the person of his right to refuse to consent; and (5) the person was told that a search

---

[305] *United States v. Hudson*, 100 F.3d 1409, 1419 (9th Cir 1996).
[306] Dkt. 315 at 7.
[307] *United States v. Bates*, 47 F. App'x 477, 479 (9th Cir. 2002).
[308] *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997).
[309] *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 227 (1973)).

49

warrant could be obtained."[310] "Although the presence or absence of one of these factors is not dispositive of the voluntariness inquiry in any given case, many [Ninth Circuit] decisions upholding consent as voluntary are supported by at least several of the factors."[311] Further, in the absence of consent, officers may "[search] the area within the arrestee's immediate control to look for weapons or destructible evidence," presuming "the area [is] under the arrestee's immediate control when he was arrested" and "events between the time of the arrest and search [do] not render the search unreasonable."[312]

The Chief Magistrate Judge found that the search of M. Coma's backpack did not violate his Fourth Amendment rights.[313] First, the Court noted that the record shows M. Coma consented to the search of his backpack[314] and he failed to dispute the Government's argument that the search was consensual.[315] Second, even if M. Coma did not provide consent, the Chief Magistrate Judge concluded that the search of his backpack was performed as a lawful search incident to his arrest because the backpack was within his immediate control in the patrol vehicle and was searched immediately after he was arrested and placed in the vehicle.[316] Thus, the record supported the Court's finding that the half-hour delay between M. Coma's initial detention and the search of his backpack was reasonable.[317] The Chief Magistrate Judge also noted that because M. Coma's objections "do[] not add to what was before this Court" when it drafted the Initial R&R, the Court "refer[s] to its findings in the [Initial R&R] in response to this objection."[318]

---

[310] *Id.*
[311] *Id.* at 1327 n.3.
[312] *United States v. Nohara*, 3 F.3d 1239, 1243 (9th Cir. 1993).
[313] Dkt. 298 at 7–11.
[314] *Id.* at 7–9.
[315] *Id.*
[316] *Id.* at 10–11.
[317] *Id.*
[318] *Id.*

Although he does not point to evidence in the record that could rebut officers' testimony that he provided consent, M. Coma argues the search of his backpack was not a lawful search incident to his arrest.[319] He argues that officers waited an unreasonable amount of time to search the backpack and that it was not "within his immediate control" because he was handcuffed at the time.[320] Therefore, he asserts the search was unlawful.[321]

The Court agrees with the Chief Magistrate Judge that the Government has met its burden to establish that M. Coma consented to the search of his backpack. The searching officer testified that he "asked [M. Coma] if [the officer] could search [his backpack] to look" for contents of the parcel and that Coma consented to the search.[322] M. Coma argues that he "did not knowingly and voluntarily consent to a search of his backpack,"[323] but he did not provide evidence rebutting the searching officer's testimony or testify that the backpack was taken without his consent.[324] Although M. Coma was certainly in custody at the time, the record reflects that M. Coma consented to the search. Therefore, the Court concludes that the Government met its burden to establish M. Coma's consent and that he lacked a reasonable expectation of privacy in his backpack at that point.

Alternatively, even if M. Coma did not provide consent, the Court agrees with the Chief Magistrate Judge that its search was valid as a search incident to arrest. Officers may "[search] the area within the arrestee's immediate control to look for weapons or destructible evidence," presuming "the area [is] under the arrestee's immediate control when he was arrested" and "events

---

[319] Dkt. 295 at 4–5.
[320] *Id.* at 5.
[321] *Id.*
[322] Dkt. 244 at 174:1–8.
[323] Dkt. 173 at 10.
[324] Dkt. 244 at 174:6–7.

between the time of the arrest and search [do] not render the search unreasonable."[325] M. Coma argues that officers waited an unreasonable amount of time to search the backpack and that it was not "within his immediate control" because he was handcuffed at the time.[326] However, officers arrested M. Coma while he was wearing the backpack, and thus it was still in his immediate control at that time.[327] Although officers searched M. Coma's backpack immediately after he was handcuffed and placed in the patrol car, such removal from the object to be searched does not disturb the search incident to arrest analysis.[328] Further, the backpack search occurred only 30 minutes after officers initially knocked and announced at Unit #2, and presumably much closer to the time of M. Coma's arrest after Clue Spray was detected on his hands. Such a brief period of delay between an arrest and search supports that this is a search incident to an arrest rather than a search following an arrest.[329] Therefore, the Court finds the backpack search was a valid search incident to M. Coma's arrest.

Accordingly, the Court concludes M. Coma's objections do not merit rejection or revision of the Final R&R.

---

[325] *United States v. Nohara*, 3 F.3d 1239, 1243 (9th Cir. 1993).
[326] Dkt. 295 at 5.
[327] *United States v. Bates*, 47 F. App'x 477, 479 (9th Cir. 2002).
[328] Dkt. 244 at 174:3–17; *United States v. Nohara*, 3 F.3d 1239, 1243 (9th Cir. 1993); *United States v. Hudson*, 100 F.3d 1409, 1420 (9th Cir. 1996).
[329] *Compare United States v. Bates*, 47 F. App'x 477, 479 (9th Cir. 2002) (finding a search after a "brief period" following an arrest was a search incident to arrest) *with United States v. Vasey*, 834 F.2d 782, 787 (9th Cir. 1987) (finding a "thirty to forty-five minute[]" delay between a traffic stop and the search to be unreasonable).

*C. Valley's objections do not merit revision of the Final R&R.*

Upon a *de novo* review, the Court concludes that Valley's objections do not merit revision or rejection of the Final R&R.

    1.  <u>Valley's initial detention did not constitute an arrest.</u>

First, the Court agrees with the Chief Magistrate Judge that Valley's initial detention did not amount to an arrest. "Whether an arrest has occurred 'depends on all of the surrounding circumstances, including the extent that freedom of movement is curtailed and the degree and type of force or authority used to effectuate the stop.'"[330] The dispositive question is "whether, under all of the circumstances, 'a reasonable person would conclude he was under arrest.'"[331]

The Chief Magistrate Judge found that Valley's detention did not constitute an arrest.[332] Distinguishing *Muehler v. Mena*[333] and *United States v. Robertson*,[334] and comparing Valley's initial detention to the Comas' detention and subsequent arrest, the Court noted that Valley "was detained for approximately one hour following the initial entry of his apartment, but he was ultimately free to leave after law enforcement concluded its searches and interviewed him."[335] Moreover, given the circumstances involved multiple suspects and two apartments and "were dangerous in their own right," "[t]he hourlong detention was reasonable" because "law enforcement [did not have] a duty to permit Valley to leave while the initial searches and interviews were ongoing."[336] As the duration of Valley's temporary detention was reasonable and

---

[330] *United States v. Patterson*, 648 F.2d 625, 632 (9th Cir. 1981) (quoting *United States v. Harrington*, 636 F.2d 1182, 1186 (9th Cir. 1981)).
[331] *Id.* (quoting *Harrington*, 636 F.2d at 1186).
[332] Dkt. 297 at 3–6.
[333] 544 U.S. 93 (2005).
[334] 833 F.2d 777 (9th Cir. 1987).
[335] Dkt. 270 at 5.
[336] *Id.* at 6.

Case 3:22-cr-00044-TMB-MMS   Document 328   Filed 08/21/24   Page 53 of 68

no excessive force was used, the Chief Magistrate Judge concluded that "a reasonable person in Valley's shoes would have known that he was not being held indefinitely."[337]

Valley argues that the Court erred in finding his detention did not amount to an arrest and that the Court's reliance on *Muehler v. Mena* was misplaced.[338] Citing *Kraus v. City of Pierce*,[339] *United States v. Stickler*,[340] *United States v. Ramos-Zaragosa*, and *United States v. Beck*,[341] he asserts that "[t]he ultimate question is whether, in view of all the circumstances, a reasonable person would believe himself to be under arrest."[342] He also observes that, unlike in *Mena*, the officers here did not have a search warrant or detain the occupants for the purposes of executing it.[343] Further, he argues that "[t]he brandishing of firearms by 5 law enforcement officers, the use of handcuffs during his detention, the illegal search of [] Valley's hands for Clue Spray, the interrogation, and the seizure of his cellphone without his consent constituted excessive force for a detention under the circumstances."[344]

The Court finds that, although the question is a close one, Valley's temporary detention did not constitute an arrest. Valley argues that *Mena* is distinguishable because there, the officers detained the occupants of a residence pursuant to executing a search warrant, which did not occur here. However, this is not a factor the Ninth Circuit considers in determining whether an arrest has occurred. Rather, the Ninth Circuit considers the duration of detention, whether officers used excessive force, and whether the defendant is free to leave.[345] "[M]ore than the restriction of liberty

---

[337] *Id.* at 13–14 (citing *United States v. Patterson*, 648 F.2d 625, 634 (9th Cir. 1981)).
[338] Dkt. 314 at 1–9.
[339] 793 F.2d 1105, 1108–09 (9th Cir. 1986).
[340] 490 F.2d 378, 379 (9th Cir.1974).
[341] 598 F.2d 497, 500-501 (9th Cir. 1979).
[342] Dkt. 314 at 2 (citing *Kraus*, 793 F.2d at 1108–09).
[343] *Id.* at 3–4.
[344] *Id.* at 8.
[345] *United States v. Patterson*, 648 F.2d 625, 632–33 (9th Cir. 1981).

54

is required. The other critical consideration is the degree and manner of force used in the stop and detention."[346] Moreover, officers "may impose such a restriction to maintain the status quo while making an initial inquiry, provided the force displayed is not excessive under the circumstances."[347]

The record reflects that the officers did not use force to detain the occupants. Rather, unlike the officers in *Kraus, Strickler,* and *Ramos-Zaragosa*, who pointed their guns at detainees, the officers here issued instructions to the occupants with their guns lowered and pointed to the ground and with their fingers off the triggers. Thus, the Court disagrees with Valley's assertion that "he was held at gunpoint" for the purposes of determining whether his detention turned into an arrest.

Further, although Valley cites *Beck* for the proposition that excessive force may turn a detention into an arrest even when officers do not draw their guns, that case was decided on markedly different facts. There, the officers used four patrol vehicles to box in detainees in a moving taxi at the U.S. border even though there was nothing "erratic or unusual about the progress of the taxi or the behavior of appellants to require precautionary force at the time the stop was made" and then removed the detainees to separate locations.[348] The Ninth Circuit noted such a detention was unreasonable based on the facts because "even though no guns were drawn or pointed . . . [such force] was neither precipitated by the conduct of the appellants nor justified by the immediate environment and events."[349] In this case, no such conclusion is supported. Although the occupants similarly complied with officer requests, preceding events indicated the parcel was in Unit #2 and that the parcel had been opened; thus, exigent circumstances warranted Valley's

---

[346] *United States v. Beck*, 598 F.2d 497, 501 (9th Cir. 1979).
[347] *Patterson*, 648 F.2d at 633.
[348] *Beck*, 598 F.2d at 502.
[349] *Id.*

detention to prevent the imminent destruction of evidence within. The Court also declines to find, absent supporting case law, that "the use of handcuffs during his detention, the illegal search of [] Valley's hands for Clue Spray, the interrogation, and the seizure of his cellphone without his consent constituted excessive force for a detention under the circumstances."[350] Therefore, there is no analogous use of force to that found unreasonable in *Beck*.

Even if an innocent person in Valley's position might reasonably believe he was not free to leave, officers are permitted to "briefly stop[] and detain[] for the purposes of limited inquiry and weapons frisk, or 'to maintain the status quo momentarily while obtaining more information.'"[351] After detaining Valley, officers interviewed the occupants and performed a security sweep of Unit #2. Thus, he could not reasonably have assumed he was being taken into custody indefinitely at that point, even if he was subjectively not aware of the detection of Clue Spray on the Comas' hands. Further, after the ultraviolet light revealed no Clue Spray on his hands, a reasonable innocent person would not have believed he would be taken into custody indefinitely. Nor does the Court find that Valley was detained for approximately one hour determinative.[352] Therefore, the Court agrees that Valley's detention did not amount to an arrest.

2. Valley was not arrested in his residence.

Because the Court agrees with the Chief Magistrate Judge that Valley was not arrested at all, it also concludes that he was not arrested "in his residence."

---

[350] Dkt. 314 at 8.

[351] *Patterson*, 648 F.2d at 633.

[352] *See Muehler v. Mena*, 544 U.S. 93 (2005) (finding two-to-three-hour long detention was not an arrest).

Valley separately argues that he was arrested in his residence without an arrest warrant or probable cause.[353] He cites *United States v. Al-Azzawy*[354] for the proposition that "an arrest can occur within a residence even if the defendant crossed the threshold of the residence to make initial contact with law enforcement," and argues that he "was coerced by law enforcement to leave the security of his home" and was thus "arrested in his home . . . without an arrest warrant or probable cause."[355] He reiterates arguments that a reasonable person in his position would have believed he was under arrest in the circumstances and that he was thus arrested upon initial detention.[356]

The Court concludes that Valley was not arrested in his residence. Although Valley compares his case to *Al-Azzawy*, the Court finds that case distinguishable. In *Al-Azzawy*, the Ninth Circuit held that officers arrested the occupant within the scope of his residence when they used force to remove him, even though he crossed the threshold to make initial contact.[357] However, officers there surrounded the occupant's residence (a trailer) with weapons drawn and used a bullhorn to instruct him to leave.[358] Based on these facts, the court held that "[a]ny reasonable person would have believed he was under arrest in these circumstances" and that the arrest occurred within the trailer.[359] Here, officers did not point their firearms at Valley or coerce him to remove him from his apartment, and he was subsequently detained outside of his apartment, but not arrested. Therefore, the Court concludes that he was not arrested in his residence.

---

[353] Dkt. 314 at 10–12.
[354] 784 F.2d 890 (9th Cir. 1985).
[355] Dkt. 314 at 11–12.
[356] *Id.* at 11.
[357] *Al-Azzawy*, 784 F.2d at 891.
[358] *Id.* at 893.
[359] *Id.*

3.  <u>There was probable cause to arrest Valley.</u>

The Court also agrees with the Chief Magistrate Judge that there was sufficient probable cause to arrest Valley.

The Chief Magistrate Judge concluded that even if Valley was arrested, there was probable cause to support the arrest.[360] Citing *United States v. Hernandez*[361] and distinguishing *Ybarra v. Illinois*,[362] the Court found that Valley was not "mere[ly] presen[t]" in Unit #2 because he resided there and "invit[ed] a small group of individuals into [his] home," the parcel was transported to that location, the contents of the parcel were found in his pantry, and officers found $29,000 in U.S. currency within the apartment, all of which supported probable cause to arrest.[363] The Chief Magistrate Judge also found that there was probable cause to arrest Valley "[e]ven excising the evidence of further crimes such as drug paraphernalia and the large sum of money" found in Valley's apartment.[364] Notably, "[the] Court [did] not find it more plausible that one would simply bring the quantity of drugs believed to be in this parcel to one's next-door neighbor's house to the surprise of the occupant"; otherwise, "[F. Coma] would have invited the unnecessary risk that Valley would have reported the plot or demanded a share of the proceeds."[365]

Valley argues that the Chief Magistrate Judge erred in finding that probable cause existed to arrest him.[366] He maintains that he was arrested upon his initial detention, and that such an arrest lacked probable cause because "law enforcement did not know that [he] resided in Unit #2," that "[his] residence was the destination of the suspect parcel," that "the parcel entered [his] unit," or

---

[360] Dkt. 297 at 6–8.
[361] 322 F.3d 592 (9th Cir. 2003).
[362] 444 U.S. 85 (1979).
[363] Dkt. 297 at 6–8.
[364] *Id.* at 14–15.
[365] *Id.* at 15.
[366] Dkt. 314 at 12–14.

that "the contents of the parcel were in [his] residence."[367] Rather, he argues, his arrest was predicated on "the simple presence of the package in [his] apartment . . . [which] is not sufficient to establish probable cause."[368] Further, he suggests that the Chief Magistrate Judge "erred in relying upon evidence that was found after [his] arrest to support a finding of probable cause."[369] Even if he was arrested during a search for Clue Spray on his hands or upon his detention in a patrol car, he argues that officers could not have known the location of the contents of the parcel in the pantry or the presence of $29,000.[370] He points to an officer's testimony that probable cause did not exist to arrest Valley and suggests this statement should be considered in determining whether probable cause existed.[371]

The Court concludes that even if Valley was arrested, there was sufficient probable cause to arrest him even prior to discovery of subsequent drug paraphernalia and the $29,000 in Unit #2. The record reflects that: law enforcement observed F. Coma accompany a co-conspirator to retrieve the parcel containing sham substances at a U.S. post office, transport the parcel to the apartment complex, and then enter Unit #2 carrying what appeared to be the parcel under his sweatshirt; that the G.P.S. tracker indicated the parcel likely was in Unit #2 and had been opened; that an initial sweep revealed the parcel opened in a garbage can; that Valley was present in Unit #2 where the parcel was located; and that Unit #2 was rented by him. Thus, even if Valley was arrested prior to the subsequent search of Unit #2 and discovery of the parcel's contents and the money, and before using an ultraviolet light on his hands, the Court agrees with the Chief Magistrate Judge that these findings create a "fair probability" that Valley committed the crime of

---

[367] *Id.* at 12–13.
[368] Dkt. 284 at 4.
[369] Dkt. 314 at 13.
[370] *Id.* at 13.
[371] *Id.* at 13–14.

attempted possession of controlled substances and that he was not a mere "proximate or peripheral figure to a crime."[372] The Court also does not consider dispositive USPIS Grow's testimony that he did not believe that there was probable cause to arrest Valley.[373] Therefore, the Court concludes that even if Valley was arrested, there was probable cause for his arrest independent of subsequent evidence of unlawful conduct.

### 4. The search yielding Valley's cellphone was constitutional.

The Court finds that the warrantless search of Unit #2 or Valley's person and the subsequent seizure of Valley's cellphone did not violate his Fourth Amendment rights. "[W]arrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement."[374] "[E]xigent circumstances . . . justif[y] a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense. Where . . . the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless [searches] to prevent the destruction of evidence is reasonable and thus allowed."[375]

The Chief Magistrate Judge found that law enforcement's seizure of Valley's cellphone was proper and does not warrant suppression because there was sufficient probable cause to arrest Valley and "cellphones seized in connection with suspected trafficking of controlled substances are likely to contain evidence of communications pertaining to the sale and purchase of controlled substances."[376] Therefore, there was sufficient probable cause to seize his cellphone.[377]

---

[372] *See United States v. Hernandez*, 322 F.3d 592 (9th Cir. 2003) (distinguishing *Ybarra v. Illinois*, 444 U.S. 85 (1979)).
[373] Dkt. 244 at 69:23–70:1.
[374] *Kentucky v. King*, 563 U.S. 452, 462 (2011).
[375] *Id.*
[376] Dkt. 297 at 9–10 (citing Dkt. 244 at 171:1–7).
[377] *Id.*

Valley argues that the search yielding his cellphone was unconstitutional because officers "seize[d] his cell[]phone without a warrant and without his consent."[378] He asserts that he was arrested with his hands handcuffed behind his back when officers seized his cellphone from his pocket, and therefore this was not a search incident to the arrest because the phone was not within "the area from within which he might gain possession of a weapon or destructible evidence."[379] Moreover, he argues the search itself was improper and that the Chief Magistrate Judge "failed to identify an applicable exception to the warrant requirement under the circumstances, finding only that probable cause existed to seize the phone."[380] As such, he argues evidence related to the cellphone should be suppressed.[381]

First, the Court finds that the warrantless search of Unit #2 or Valley's person and seizure of his cellphone was justified by exigent circumstances. The record indicates that officers seized Valley's cellphone at some point during his interview while he was detained, but officers did not recall whether his cellphone was found on his person or in his apartment.[382] Regardless, the Court concludes that exigent circumstances warranted the search of Unit #2 and Valley's person to prevent the destruction of evidence. As noted by officers in this case, cellphones are relevant in drug trafficking investigations because they are used "for distribution of funds, sending money to each other, [and] paying for different things" and offer "a huge wealth of information regarding drug trafficking, drug use, and drug distribution."[383] Further, that Valley was handcuffed perhaps minimizes, but does not eliminate, the risk that evidence related to the phone might be destroyed.

---

[378] Dkt. 314 at 15–17.
[379] *Id.* at 16.
[380] *Id.* at 17.
[381] *Id.*
[382] Dkt. 244 at 109:14–20; 145:14–146:3.
[383] Dkt. 244 at 108:25–109:13.

Therefore, the Court concludes that the warrantless search resulting in the seizure of Valley's cellphone was justified under the circumstances.

Second, even if Valley was arrested at the time his phone was seized, the Court finds that this search was valid incident to his arrest. Valley argues that he was handcuffed and "had no ability to access the cell[]phone to damage or destroy it."[384] However, officers seized the phone upon asking Valley if he had a phone; Valley responded affirmatively, and officers stated "we're going to have to take that from you."[385] Based on this testimony and evidence, it is reasonable to assume that the cellphone was on Valley's person or within his immediate control in the apartment upon its seizure. Given the presence of the cellphone in connection with evidence of drug trafficking, the Court concludes that even if Valley was arrested at that point, the search yielding the cellphone was a lawful search incident to his arrest.

5. The temporary seizure of Valley's cellphone does not warrant suppression because it was reasonable.

The Court further agrees with the Chief Magistrate Judge that the seizure of Valley's cellphone does not warrant suppression because it was supported by probable cause and officers did not unreasonably delay in securing a search warrant. The Ninth Circuit has held that where probable cause supports a seizure, there is a risk evidence might be destroyed, officers make "reasonable efforts to reconcile their law enforcement needs with . . . personal privacy," and officers "impose[] the restraint for a limited period of time," a temporary warrantless seizure is reasonable and does not warrant suppression.[386] Moreover, suppression of evidence is appropriate

---

[384] Dkt. 314 at 16.
[385] Dkt. 244 at 145:24–146:3; Ex. D3-E.
[386] *Illinois v. McArthur*, 531 U.S. 326, 332–33 (2001).

only where the deterrent value to combat "deliberate, reckless, or grossly negligent conduct" by law enforcement outweighs that "substantial social costs" of suppression.[387]

The Chief Magistrate Judge found that law enforcement's seizure of Valley's cellphone "was not wrongful" and did not warrant suppression.[388] First, noting cellphones seized in drug trafficking cases are likely to contain evidence of drug transactions, and the cellphone was seized in the presence of the parcel and other drug paraphernalia, the Court noted that the seizure was supported by sufficient probable cause.[389] Further, the seven-day delay in obtaining a search warrant for the cellphone was reasonable and not "deliberate, reckless, or grossly negligent conduct" or a "pattern of misconduct" given that officers were "cataloging evidence pertaining to a multi-day operation and searches of two apartments involving several suspects."[390] And, even if the seizure was wrongful, the Chief Magistrate Judge observed that Valley did not rebut the Court's finding that there was no evidence of "deliberate, reckless, or grossly negligent conduct" in obtaining the search warrant to "justify the societal cost of [the phone's] exclusion."[391]

Valley argues that the Chief Magistrate Judge erred in finding that the delay in applying for a search warrant was not "deliberate, reckless, or grossly negligent conduct."[392] He maintains that "the cell[]phone was . . . taken from [his] person prior to the application for the search warrants for Apartments #2 and #3," and that "[l]aw enforcement could have applied for a search of the cell[]phone at the same time as the applications were made for the search of the

---

[387] *Herring v. United States*, 555 U.S. 135, 141, 144 (2009).
[388] *Id.* at 8–10.
[389] *Id.* at 9.
[390] *Id.*
[391] *Id.*
[392] Dkt. 284 at 5.

apartments."[393] However, he suggests that they did not do so "because they did not believe that they had sufficient evidence to support such a warrant."[394]

Here, having concluded there was sufficient probable cause to support Valley's arrest for attempted possession of controlled substances, and noting that cellphones seized in connection with evidence of drug trafficking are likely to contain such evidence, the Court finds there was sufficient probable cause to seize Valley's cellphone. Further, although Valley was handcuffed and compliant at the time of the cellphone's seizure, officers reasonably could have concluded that, unless restrained, Valley would have sought to eliminate evidence of drug trafficking on the cellphone. Moreover, officers did not search the cellphone or arrest Valley until they secured a warrant for the cellphone and thus "made reasonable efforts to reconcile their law enforcement needs with the demands of [his] personal privacy."[395] The Court also agrees with the Chief Magistrate Judge that law enforcement's seven-day delay in securing a warrant, while undesirable, did not constitute "deliberate, reckless, or grossly negligent conduct" warranting suppression. Based on the record, and given the complexity of the subsequent investigation, the Court concludes that this "time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant."[396] Thus, this seizure was reasonable under the circumstances and does not warrant suppression.

---

[393] *Id.*

[394] *Id.*

[395] *Illinois v. McArthur*, 531 U.S. 326, 332–33 (2001).

[396] *Id.* at 332; *compare United States v. Place*, 462 U.S. 696, 709–10 (holding 90–minute detention of luggage unreasonable based on nature of interference with person's travels and lack of diligence of police), *with United States v. Van Leeuwen*, 397 U.S. 249, 253 (1970) (holding 29–hour detention of mailed package reasonable given unavoidable delay in obtaining warrant and minimal nature of intrusion).

64

6.  <u>The search warrant affidavit for Valley's cellphone was sufficient.</u>

The Court agrees with the Chief Magistrate Judge that the search warrant affidavit for Valley's cellphone was supported by probable cause and facially sufficient. An application for a search warrant "must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter."[397] "[T]he resolution of doubtful or marginal cases [determining whether an affidavit demonstrates probable cause] should be largely determined by the preference to be accorded to warrants."[398]

The Chief Magistrate Judge found that the cellphone warrant was supported by probable cause.[399] The Court noted that the Magistrate Judge who issued the warrant properly relied on officer averments that "(1) [Valley] was in Unit #2; (2) the parcel that underwent controlled delivery for controlled substances was found upon entry of Unit #2; (3) that a cellphone was seized among others that law enforcement believed belonged to Valley; (4) that other items such as approximately $29,000 USD and scales had been found; and (5) that individuals involved in the distribution of controlled substances often communicate via cellphones to arrange for the sale and delivery of the same."[400] Further, although the warrant application did not describe how the cellphone was seized or whether it was taken with Valley's consent, such omissions were not misleading because there was sufficient probable cause without them and the Court concluded officers' testimony was credible.[401]

Valley submits that officers' omission that the cellphone was the product of a warrantless search from the affidavit was "deliberate, reckless, or grossly negligent conduct" and "misled the

---

[397] *Franks v. Delaware*, 438 U.S. 154, 165 (1978).
[398] *United States v. Ventresca*, 380 U.S. 102, 109 (1965).
[399] Dkt. 297 at 10–12.
[400] *Id.* at 11.
[401] *Id.* at 12 & n.52.

Court to believe that [his] cell[]phone was lawfully seized."[402] He speculates that "[h]ad the Magistrate Judge who issued the warrant known that the cell[]phone was seized pursuant to an illegal search of [his] person, a search warrant for the contents of the phone would have been denied."[403]

The Court concludes the search warrant affidavit was sufficient. Here, the affidavit averred that Valley was in Unit #2, that an initial sweep revealed the parcel was in Unit #2, that officers seized a cellphone belonging to Valley, that subsequent drug paraphernalia and large quantities of money were discovered in Unit #2, and that cellphones are commonly used to coordinate drug transactions.[404] Thus, the Court concludes that the affidavit was supported by probable cause to search Valley's cellphone.

Further, the Court is not persuaded that any information the affidavit may have lacked regarding the warrantless search yielding the cellphone rendered the affidavit facially insufficient or constituted "deliberate, reckless, or grossly negligent conduct" by law enforcement. Valley presumes, without citing to authority or addressing other indicia of probable cause in the affidavit, that the issuing magistrate judge would have denied the search warrant had such information been included. However, this ignores ample probable cause in the affidavit to search Valley's phone and that cellphones seized in connection with drug trafficking offenses often contain relevant evidence of drug transactions. Moreover, officers could not recall where the cellphone was seized,[405] and thus information regarding the cellphone's location in the apartment was not a "misrepresentation," as Valley asserts, let alone a "deliberate, reckless, or negligent omission."[406]

---

[402] Dkt. 314 at 18.
[403] *Id.*
[404] *See* Exh. D1-L.
[405] *See* Dkt. 244 at 109:14–20; 145:14–146:3.
[406] Dkt. 314 at 18.

Nor was any omission material, given the probable cause supporting the search warrant. Thus, concluding that the search warrant affidavit was sufficient, and any omissions immaterial, the Court determines that evidence related to Valley's cellphone should not be suppressed.

Accordingly, that Court concludes that Valley's objections do not merit revision or rejection of the Final R&R.

### D. A de novo *review of the Final R&R as to Valley is unwarranted.*

The Court declines to perform a *de novo* review of the portions of the Final R&R to which Valley did not object. Valley asks this Court to perform a *de novo* review of the entire Final R&R because the parties had page limits for their objections.[407] This reason does not warrant heightened review. Moreover, the Court observes that while 28 U.S.C. § 636(b)(1) does not prohibit the Court from engaging in a *de novo* review of unobjected-to portions of the R&R, it does not require the Court to do so. Rather, the district court need only "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."[408] Having done so, the Court sees no basis for further review and accordingly **DENIES** Valley's Motion for *De Novo* Review.

## IV.    CONCLUSION

Upon a *de novo* review, the Court concludes that F. Coma's, M. Coma's, and Valley's objections do not merit revision or rejection of the Final R&Rs. Accordingly, the Court **ACCEPTS AND ADOPTS** the Final R&Rs at Dockets 296, 297, and 298 in their entirety and **DENIES** the Motions to Suppress at Dockets 109, 168, and 173. Further, seeing no basis for *de novo* review of

---

[407] Dkt. 320.
[408] 28 U.S.C. § 636(b)(1).

67

the entire Final R&R as to Valley, the Court **DENIES** the Motion for *De Novo* Review at Docket 320.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 21st day of August, 2024.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

68